Stewart, J.
 

 In this opinion we shall designate Union Properties, Inc., the substituted plaintiff in the Court of Common Pleas, as plaintiff, The Union Salt Company, The Lake Erie Salt Company and Union Salt Company as upland owners, the city of Cleveland as the city, and the Cleveland Memorial Shoreway, around which this case centers, as the shoreway.
 

 Let us say in passing that we have rarely encountered a case in which the record has been so full and complete, which has been briefed so voluminously and thoroughly that every point involved, both directly and remotely, has been discussed, and where the lawyers have shown more zeal and energy in advocating their claims.
 

 There are certain facts which have been found to be true by both the trial court and the Court of Appeals and which, for the purposes of our decision, can be considered as settled.
 

 The construction of the east basin of the Cleveland harbor in Lake Erie was begun by the federal government some time before the year 1914 and was completed in 1916. The total length of the breakwater surrounding the Cleveland outer harbor was constructed at a total cost of approximately six million dollars. The federal government constructed a breakwater which extends from a point opposite the easter
 
 *317
 
 ly bank of the Cuyahoga river to a point opposite East 70th street, which breakwater is approximately parallel with the general shore line of the lake.
 

 In 1927 a bulkhead line was established by the War Department of the United States, to which solid fill or wharfing may be extended under War Department regulations and beyond which solid fill may not be extended, and such bulkhead line extends from a point opposite East 26th street, approximately parallel with the breakwater, to a point opposite East 70th street.
 

 Likewise, in 1927 the War Department established a pierhead line approximately 600 feet distant from the bulkhead line, which pierhead line extends from a point opposite East 26th street to a point opposite East 70th street and was established to mark the line to which structural wharves or piers may be extended from the bulkhead line, upon permit issued therefor by the War Department, and beyond, which a pier may, in no event, be extended.
 

 The land of the plaintiff and the upland owners is located on the east basin of the Cleveland harbor as upland property. The owners of these properties have title which extends to the natural shore line of Lake Erie, which is the 1914 shore line as determined by a survey.
 

 All land in front of the upland of the plaintiff and upland owners and to the north of the natural shore line has been made by an artificial fill, and the determination of the rights of the city, the plaintiff and the upland owners in this made land is a crucial question in this case.
 

 The land comprising East 55th street to Lake Erie was appropriated by the city in 1873 for street pui'poses, whereby the city acquired all littoral rights appurtenant to such land for the purposes for which the land was appropriated. The city filled in in front of
 
 *318
 
 the upland comprising such street, as the result of which there came into existence made land extending out at the street’s westerly end to approximately the point to which the fill in front of plaintiff’s land extends, which made land of the city is subject to the same easement for street purposes as the upland so appropriated.
 

 .Both the trial court and the Court of Appeals defined the boundaries within which the plaintiff and upland owners have their littoral rights, if any, and although those boundaries were disputed in the pleadings they must be considered now as settled, in accordance with the findings of both the courts below, and we understand from briefs and arguments that all parties to this case acquiesce in the correctness of the boundary lines.
 

 There is no question in this case as to the title which plaintiff acquired in foreclosure proceedings against its predecessor in title, The Wilson Realty Company, or as to the title to the property as far as the natural shore line of the upland owners, or that The Lake Erie Salt Company was the upland owner of the property up to May 31, 1944, or that Union 'Salt Company has been the upland owner thereof since that date.
 

 There is no question in this case that plaintiff’s predecessor in title, The Wilson Realty Company, after it became the owner of its upland in 1905, and the plaintiff, after it acquired title pending this suit, invited the public generally to dump waste material over the bank of the upland and thus to carry out such filling into the lake. There is no dispute that plaintiff’s predecessor in title and plaintiff each made an arrangement with the city for the latter to dump waste in front of the upland now owned by plaintiff and that as a result of such arrangements the city, between September 1928 and some time in 1935, dumped 66,018 loads of
 
 *319
 
 such waste, averaging about five yards to the load and each load making about three yards of fill. Substantially all the made land in front of plaintiff’s upland north of the natural shore line and extending toward navigable water was created in this manner.
 

 The testimony offered in the trial court on behalf of plaintiff was to the effect that this dumping was done for the dual purpose of wharfing out from the upland to navigable waters and making land to be added to the upland.
 

 There was considerable testimony concerning various plans which the city had under consideration from time to time in reference to the improvement and development of the east basin harbor but apparently none of those plans was officially adopted until 1942 when the city council adopted the so-called Pucel plan, which shows a prospective development of the east basiu harbor as a place for recreation and pleasure.
 

 In December 1935 the city council adopted ordinance No. 103455, which provided for the construction of a highway adjacent to Lake Erie from East 9th street to 72nd street. In later ordinances this road was referred to as Lake Front road and, later still, as Memorial Shoreway.
 

 The original ordinance refers to the fact that the federal government had made available upwards of six milliou dollars for the purpose of constructing the road north of the lake front on filled land along the natural shore line of Lake Erie. The expenditure of such sum was for the purpose of providing work for the unemployed and thereby contributing to the immediate relief of the destitute.
 

 The ordinance states that the federal government made plain that direct relief was to end about the date of the passage of the ordinance and the only way that further assistance might be obtained from the federal
 
 *320
 
 government was through a project such as was provided for in the ordinance.
 

 Section 1 of the ordinance was amended December 4, 1939, and in part reads as follows:
 

 “Section 1. That this council hereby declares its intention to open a street from East 9th street to East 70th street, thereby making direct access to all piers, docks and wharves now or hereafter constructed on the lake front and to establish the lines of said street a width of 230 feet between East 9th street and East 70th street. The northerly line thereof being 150 feet northerly and the southerly line 80 feet southerly by rectangular or radial measurement from the following described main base line.”
 

 Then follows a description of the boundaries of the road.
 

 This same ordinance recites further:
 

 “The title to the filled land on which said street is to be constructed is in the state of Ohio, the use and development of which in aid of navigation is, by statute, given to the city of Cleveland.
 

 “So much of the land, if any, within said roadway, as lies southei’ly of the natural shore line shall be acquired from the owners thereof by appropriation or otherwise.”
 

 All the road as constructed is north of the natural shore line.
 

 Section 2 of the original ordinance providing for the construction of the road is as follows:
 

 “That the mayor be and he is hereby authorized fo co-operate with the federal government in arranging for the construction of said roadway or street, it being understood and agreed that said work shall be done without in any way impairing or otherwise affecting the right, title and interest of the owners of the land forming the natural shore line of Lake Erie be
 
 *321
 
 tween the points aforesaid and that the owners of the land abutting on the proposed roadway shall have the right, at their own expense,, to cross said highway either above or below grade as they may elect, provided such overhead structures shall be of height sufficient to allow ordinary street traffic to pass freely thereunder and any underground structures shall be so built so as not to, in any way, injure, weaken or impair said roadway. ’ ’
 

 The shoreway was constructed during 1936 and 1937 as a four-lane highway passing in front of the property of the plaintiff and the upland owners on the made land north of the 1914 natural shore line. An amending ordinance of December 12, 1939, provides for the extension of the width of the shoreway as a divided highway to 230 feet.
 

 The shoreway was constructed without the consent of the plaintiff, its predecessor in title or the upland owners. It is the claim of the plaintiff and the upland owners that the shoreway either destroys or greatly diminishes their littoral rights to wharf out to navigable waters and, with reference to plaintiff, its use of the wharf it claims to have made; the other upland owners conceding that they did not fill in any of the lake beyond the 1914 natural shore line.
 

 As the shoreway has been built and is in constant use, no question is now made that plaintiff is entitled to an injunction against its use, but the question is as to the right to an assessment of damages for the impairment of and interference with the littoral property rights and for the value of the 124,757 cubic yards of earth which it is conceded was taken from the fill in front of plaintiff’s property and used in the construction of the shoreway.
 

 In the voluminous briefs filed in this case there are extensive discussions of the nature of the title of the
 
 *322
 
 state of Ohio to subaqueous and filled lands beyond the natural shore line of Lake Erie and the littoral rights of the abutting upland owners over such sub-aqueous and filled-in territory out to the line of navigation. There is a full discussion of the common-law rule to the effect that the title to subaqueous and marginal lands of tidal and navigable waters in Great Britain is in the crown, that the law with reference to tidal waters in Great Britain applies not only to tidal waters in the United States but likewise is applicable to the waters of Lake Erie, and that the title to sub-a.queous and filled-in .lands beyond high water mark is in the state bordering upon such waters.
 

 We do not deem it necessary, however, to analyze or discuss the vast number of cases cited with reference to either tidal waters or nontidal navigable waters for the reason that this court has heretofore decided the nature of the title of the state of Ohio with reference to the waters of Lake Erie and the littoral rights of the upland owners on the shores of Lake Erie to have access to navigable water therein and to wharf out to the same.
 

 In the case of
 
 State
 
 v.
 
 Cleveland & Pittsburgh Rd. Co.,
 
 94 Ohio St., 61, 113 N. E., 677, L. R. A. 1917A, 1007, which case shall hereafter be designated the
 
 C. é P. case,
 
 the syllabus reads as follows:
 

 “1. Under the constitutional grant of authority to regulate interstate and foreign commerce, the Onifed States government has paramount control of navigable waters and power to establish therein harbor lines and regulations.
 

 “2.
 
 The title and rights of littoral and riparian proprietors in the subaqueous soil of navigable waters, within the limits of a state, are governed by the laws of the state, subject to the superior authority of the federal government.
 

 
 *323
 

 “3.
 
 The title of the land under the waters of Lake Erie within the limits of the state of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted.
 

 “4.
 
 The state has control of a harbor within a harbor line and may enact legislation prescribing regulations in connection therewith and to secure the rights of the public, provided it does not conflict with the regulations of the federal government.
 

 “5. The littoral owner is entitled to access to navigable water on the front of which his land lies, and, subject to regulation and control by the federal and state governments, has, for purposes of navigation, the right to wharf out to navigable water.
 

 “6. The ownership of the waters of Lake Erie and of the land under them within the state is a matter of public concern. The trust with which they are held is governmental, and the state, as trustee for the people, cannot by acquiescence or otherwise abandon the trust property or permit a diversion of it to private uses different from the object for which the trust was created. The littoral owner is charged with knowledge that nothing can be done by him that will destroy the rights of the public in the trust estate.”
 

 The
 
 C. & P. case
 
 was an action in the Common Pleas Court of Cuyahoga county to enjoin railroads from filling in the waters of the Cleveland harbor in Lake Erie in front of their lands. The claim was made by the state that the submerged territory in front of the lands of the railroad companies was owned by the state of Ohio and that the companies were filling up the waters of Lake Erie without any grant from the government of the United States or the state of Ohio.
 

 The companies admitted their ownership of the uplands, the filling in as outlined in the petition and alleged that in order to avail themselves of their rights
 
 *324
 
 as littoral owners it was necessary to fill in the bed of the lake in order to wharf ont into the harbor to reach navigable water.
 

 The right of the state to an injunction was denied and the law was declared in the syllabus,
 
 supra.
 

 Judge Johnson, who wrote the opinion in the
 
 G. & P. case,
 
 discussed at length the common law as to title in subaqueous land in tidal and navigable waters, cited and commented upon many cases in both the federal and state courts, and then stated in the opinion, at page 77:
 

 “After a careful examination we are convinced that in most of the states of the United States the conclusion has been arrived at, either by judicial reasoning or by statutory provision which has been upheld, that, subject to regulation and control by the federal and state governments, the littoral owner has the right to wharf out to navigable waters, provided he does not interfere with the public rights of
 
 navigation
 
 or
 
 fishery
 
 [italics ours], and that the state holds the title to the subaqueous land of navigable waters as the trustee for the protection of the public rights therein. Piers and wharves are a necessary aid to navigation, as much so as the harbor itself, and the right to construct them is as important and essential. Without them the operations of commerce would be seriously weakened. If they are to be useful these piers must extend into water of sufficient depth to float loaded vessels. The littoral owner has an undoubted right of access to the water, and if this right is to be of value it must be such access as will enable him to reach
 
 navigable
 
 water and to do the things necessary to that end.”
 

 On page 79 in the
 
 C. & P. case
 
 is a further statement of Judge Johnson, as follows:
 

 “As shown, the state holds the title to the sub-aqueous land as trustee for the protection of public
 
 *325
 
 rights. The power to prescribe such regulations resides in the Legislature of the state.
 

 “When, as in this case, the United States government has fixed a harbor line, the state has power to regulate navigation and fishing between that line and the shore, provided its regulations do not conflict with those of the general [federal] government. Our General Assembly has enacted no legislation providing such regulations.
 

 “Until the enactment of appropriate legislation the littoral owner, for the purposes of navigation, should be held to have the right to wharf out to the line of navigability, as fixed by the general [federal] government, provided he does not interfere with public rights. Otherwise, through the mere absence of legislation by the state, the supreme utility and value of navigable waters — navigation and commerce — would be defeated. Whatever he does in that behalf is done with knowledge on his part that the title to the sub-aqueous soil is held by the state as trustee for the public, and that nothing can be done by him that will destroy or weaken the rights of the beneficiaries of the trust estate. His right must yield to the paramount right of the state as such trustee to enact regulatory legislation. It must be remembered that his right, pending appropriate legislation, is one that can be exercised only in aid of navigation and commerce, and for no other purpose. What he does is, therefore, in furtherance of the object of the trust and is permitted solely on that account.
 

 “The state as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created.
 

 “If it is once fully realized that the state is merely the custodian of the legal title, charged with the spe
 
 *326
 
 cific duty of protecting the trust estate and regulating its use, a clearer view can be had.
 

 “An individual may abandon his private property, but a public trustee cannot abandon public property. Mere nonuser of the trust property by the public cannot authorize the appropriation of it by private persons to private uses and thus thwart the purposes of the trust.”
 

 We are of the opinion that the expression, “for the public uses to which it may be adapted,” as used in paragraph three of the syllabus in the
 
 C. & P. case,
 
 refers to public uses connected with navigation and commerce. This is definitely shown in the quotation,
 
 supra,
 
 “it must be remembered that his right, pending appropriate legislation, is one that can be exercised only in aid of navigation and commerce, and for no other purpose. What he does is, therefore, in ■ furtherance of the object of the trust and is permitted solely on that account. ’ ’
 

 If the right of the littoral owner is one that can be exercised only in aid of navigation and commerce and what he does is in furtherance of the trust and permitted solely on that account, it must follow that the trust for which the state holds title to subaqueous lands of Lake Erie must be only in aid of navigation and commerce.
 

 Our view is supported further by the quotation,
 
 supra,
 
 “the littoral owner has the right to wharf out to navigable waters, provided he does not interfere with the public rights of navigation or fishery.”
 

 The
 
 C. & P. case
 
 was decided on February 29, 1916. On March 20, 1917 (107 Ohio Laws, 587), the General Assembly passed the Fleming Act, which became effective July 2, 1917. This act is Sections 3699-u to 3699-9, inclusive, General Code.
 

 
 *327
 
 Section 3699-a, as enacted in 107 Ohio Laws, 587, provided:
 

 “It is hereby declared that the waters of Lake Erie within the boundaries of the state together with the soil beneath and their contents do now and have always, since the organization of the state of Ohio, belonged to the state of Ohio as proprietor in trust for the people of the state of Ohio, subject to the powers of the United States government, the public rights of navigation and fishery and further subject only to the right of littoral owners while said waters remain in their natural state to make reasonable use of the waters in front of or flowing past their lands, and the rights and liabilities of littoral owners while said waters remain in their natural state of accretion, erosion and avulsion. Any artificial encroachments by public or private littoral owners, whether in the form of wharves, piers, fills or otherwise beyond the natural shore line of said waters not expressly authorized by the General Assembly, acting within its powers, shall not be considered as having prejudiced the rights of the public in such domain. Nothing herein contained shall be held to limit the right of the state to control, improve or place aids to navigation in the other navigable waters of the state or the territory formerly covered thereby.”
 

 In 1945 (121 Ohio Laws, 84), Section 3699-a was amended by adding thereto the following paragraph:
 

 “The Department of Public Works of Ohio, acting by and through the Superintendent of Public Works, is hereby designated as the state agency in all matters pertaining to the care, protection and enforcement of the state’s rights designated herein. ’ ’
 

 Section 3699-1 provides:
 

 “All municipal corporations within the corporate limits of which there is or may hereafter be included
 
 *328
 
 part of the shore of the waters of Lake Erie shall have the power, in aid of navigation and water commerce, to construct, maintain, use and operate, or lease the right to construct, maintain, use and operate, piers, docks, wharves and connecting ways, places, tracks and other water terminal improvements with buildings and appurtenances necessary or incidental to such use, on any land belonging to the corporation held under title permitting such use and also over and on any submerged or artificially filled land or lands made by accretion resulting from artificial encroachments, title to which is in the state of Ohio, within the territory covered or formerly covered by the waters of Lake Erie in front of littoral land within the limits of said corporation whether said littoral land is privately owned or not. Any such municipal corporation shall also have power and authority to by ordinance subject to superior federal legislation, establish harbor lines and other regulations for said territory and to prohibit the placing, maintaining or causing or permitting to be placed therein any unlawful encroachments on said territory. The territory to which the powers hereby granted shall apply shall be limited to that within the existing or future.corporate limits of the corporation and extending into Lake Erie to the distance of two miles from the natural shore line; and for all purposes of government and exercise of said powers the corporate limits of any such coi’poration shall be held to extend out, in, over and under said water and land made or that may be made within said territory. These provisions, however, shall not have the effect of limiting the now existing boundaries of any municipal corporation and in case where two municipal corporations have upland territory fronting on said waters and there should be a conflict on account of the curve of the shore line or otherwise as to said
 
 *329
 
 two-mile boundary the boundaries of each corporation shall be a line midway between the shore line of each and not exceeding two miles from’ the shore line of either. Provided, however, that all powers hereby granted shall be exercised subject to the powers of the United States government and the public rights of navigation and fishery in any such territory and all mineral rights or other natural resources existing in the soil or waters in said territory, whether now covered by water or not, are reserved to the state of Ohio and its citizens.”
 

 Section 3699-2, General Code, provides:
 

 “When any part of the territory mentioned in Section 3699-1, title to which is in the state of Ohio, is in front of privately owned upland and has been filled in or improved by said private upland owner or his predecessor in title to said upland, then a municipal corporation shall not have the power to take possession of or lease such part of the public domain so filled or improved, without the consent of said upland owner, until said municipal corporation has complied with the laws governing the appropriation of private property for municipal purposes, except that in any such proceeding to appropriate there shall be no compensation allowed to the upland owner for the site of such fill or improvements.”
 

 Sections 3699-3 and 3699-4, General Code, are concerned with the right of a municipal corporation to lease areas described in Section 3699-1, General Code.
 

 Section 3699-5, General Code, provides for the administration of these areas.
 

 Section 3699-6, General Code, provides as to the disposition of the rental charges from the leased areas.
 

 Section 3699-7, General Code, provides that the act shall not have a retroactive effect.
 

 Section 3699-8, General Code, provides:
 

 
 *330
 
 “All right, title and interest of the state of Ohio in and to all submerged and filled lands in the harbor of the city of Cleveland, described in section 3, section 4, section 5, section 7 and section 9 in an ordinance of the city of Cleveland, designated Ordinance No. 37904-A, passed September 13th, 1915, which authorized the mayor of the city of Cleveland to enter into a contract with certain railroad companies for the purpose of securing a union passenger station for the city of Cleveland, together with all other submerged and filled lands within a tract which is bounded westerly by the east bank of Cuyahoga river as it now runs and the east government pier, northerly by the government harbor line as it is now or may hereafter be established, and easterly by a line extended northerly and at right angles or normal to the natural shore line of Lake Erie from a point, on said natural shore line, one hundred and fifty (150) feet easterly from the easterly line of East 26th street or said easterly line produced northerly, is excepted from the provisions' of Sections 3699-1 to 3699-7, inclusive, of this act. Nothing herein shall prevent the General Assembly from conveying the right, title and interest of the state in any lands described in any agreement now made between a municipality and any railroad company or companies for the purpose of securing railroad terminals and stations, and which land may be a part of the lands described in section one hereof; in any such event the conveyance shall be made in conformity with the provisions of such agreement.”
 

 Section 3699-9 provided:
 

 ‘ ‘ Should any of Sections' 3699-1 to 3699-8, inclusive, or any provision of said sections be decided by the courts to be unconstitutional or invalid the same shall not affect the validity of said sections as a whole or any part thereof other than the part so decided to be
 
 *331
 
 unconstitutional or invalid.” This section was repealed, effective September 8, 1947 (122 Ohio Laws, 240).
 

 Both plaintiff and the city by their pleadings, in their briefs and in their oral arguments contend that Section 3699-8, General Code, is invalid for the reason that the whole act is one that must be of uniform operation, and by Section 3699-8 a certain area of filled and submerged land adjacent to the shore line in the city’s outer harbor, which area is approximately two miles in length, extending from the east bank of the Cuyahoga river to a line 150 feet easterly from the projected easterly line of East 26th street, is excepted from the provisions of Sections 3699-1 to 3699-7, inclusive, General Code; and that, therefore, Section 3699-8 violates Section 26, Article II of the Ohio Constitution which provides:
 

 “All laws, of a general nature, shall have a uniform operation throughout the state * *
 

 A' mere reading of Section 3699-8 reveals that the obvious intent was to arrange for the disposal of certain filled lands along the lake front to railroad companies for the purpose of securing a union passenger station for the city. Evidently that was the purpose of excepting the land described in Section 3699-8 from the other provisions of the Fleming Act.
 

 The trial court held further that, in addition to the fact that Section 3699-8 violates Section 26, Article II of the Constitution, it violates also Section 1, Article XIII of the Constitution, which reads:
 

 “The General Assembly shall pass no special act conferring corporate powers.”
 

 The trial court was of the opinion that because Section 3699-8 excepts certain territory from the operation of other provisions of the Fleming Act, its unconstitutionality vitiates the whole act for the reason
 
 *332
 
 that it cannot be contended that that section can be dropped from the act and the .rest of it held to apply to the territory excepted by that section, because the General Assembly never extended the provisions of the act over the excepted territory and the court has not the power to do so.
 

 ■ The trial court cited the case of State,
 
 ex rel. Wilmot,
 
 v. Buckley, 60 Ohio St., 273, 54 N. E., 272, the first two paragraphs of the syllabus of which read:
 

 “1. When an act of the General Assembly, required to have uniform operation throughout the state, expressly excepts from its operation one or more cities or counties, such act by reason of such exception is unconstitutional and void.
 

 “2. Such an exception cannot be held invalid and thereby extend the apt over the- excepted territory, because in such a case the General Assembly never enacted the statute in such territory, and the court has no power to enact it therein.”
 

 The trial court, having held the entire Fleming and Abele Acts to be unconstitutional, decided the case as though there were no legislation in Ohio regulating the waters of Lake Erie.
 

 The trial court found that the city entered upon made land in front of the'upland of plaintiff and constructed thereon a sewer which was an extension of the East 55th street sewer which had theretofore ended south of the 1914 shore line; that the sewer extension was built to facilitate the construction by the city of the shoreway and was a part of such construction; that the made land in front of plaintiff’s property constituted a wharf appurtenant to plaintiff’s upland; that the city constructed thereon and opened for public travel the shoreway; that the shoreway extends from the westerly to the easterly boundary of the made land and, in fact, across not only the
 
 *333
 
 made land which constituted plaintiff’s wharf hut also on filled land in front of the upland owners ’ property; and that the shoreway, by ordinance of the council, was, contemplated to have a width of 230 feet.
 

 The trial court held further that the city had entered upon the made land of the plaintiff, constructed1 a curved roadway connecting East 55th street with the shoreway and opened the same to public travel; that all the operations of the city, hereinbefore described, in and upon the made land of the plaintiff are not works in aid of navigation and commerce; that all the operations were performed without the consent of the plaintiff or upland owners; and that the works impair, impede and interfere with access to and from plaintiff’s, upland and from that part of plaintiff’s wharf lying southerly from such works to that part of plaintiff’s wharf lying northerly of such works and to the nonnavigable and navigable waters beyond.
 

 The trial court determined that plaintiff was entitled to damages against the city for the impairment, impediment and interference with plaintiff’s access, the deprivation of its wharf and the operation thereof by the works of the city, including the 230-foot shoreway, and for taking away from the wharf 124,757 cubic yards of earth; and that a jury be impaneled to assess the amount of the damages.
 

 The trial court likewise ordered damages be awarded plaintiff for interference with plaintiff’s facility to take and discharge water of the lake to and from its upland for lawful uses and determined that plaintiff had the right to construct and maintain at its own expense conduits under the shoreway for such taking- and discharging water, and also the right to erect and maintain a structure for the purpose of crossing the shoreway, above or below grade, for the purpose of
 
 *334
 
 exercising its rights in the made and submerged land north of the shoreway.
 

 Practically the same order was made with reference to the upland owners except that the damages should be confined to the impairment, impediment and interference with access to navigable waters, they never having made any wharf or fill beyond the natural shore line of 1914.
 

 The Court of Appeals reversed the judgment of the trial court in most essential particulars and held that Sections 3699-a to 3699-7, inclusive, and 3699-9, General Code, are constitutional, and that Section 3699-8, General Code, is unconstitutional; that the .judgment of the trial court was not only against the weight of the evidence but that as a matter of law the filling in of the lake bed in front of plaintiff’s upland was not done by plaintiff or its predecessor in title; that it was not done for the purpose of wharfing out to navigable waters of the lake and the fill is not a wharf; that, for the same reasons, the earth removed by the city was not removed from made land of the plaintiff; and that the works constructed by the city were works in aid of navigation and commerce.
 

 The Court of Appeals held also that, under those sections of the Fleming Act, which that court held constitutional, the city was entitled to construct the shoreway over the filled lands in front of plaintiff’s and upland owners’ uplands so as to permit free use of such filled lands by the people of Ohio for all public purposes, including navigation, commerce or fisheries.
 

 It is the correctness or otherwise of the conclusions reached by the Court of Appeals which must determine our judgment in this case.
 

 To the writer of this opinion the reasons given by the trial court for the unconstitutionality of the Fleming and Abele Acts are more persuasive than those
 
 *335
 
 given by the Court of Appeals for upholding the constitutionality of all but Section 3699-8, General Code, a section of the Fleming Act.
 

 We agree with the conclusion of the Court of Appeals in reference to the Abele Act (Section 3699-10,, General Code) to the effect that it cannot be held to> have added to or lessened the public and private uses-as denned by Section 3699-a, General Code, or lessened the powers of the city as provided in Section 3699-1,. General Code, and, therefore, it is unnecessary to determine the constitutionality of Section 3699-10.
 

 The writer is of the opinion that Section 3699-8,. General Code, does except certain territory from the-operation of the whole Fleming Act and is, therefore,, unconstitutional as violative of the uniformity section of the Constitution; that if Section 3699-8 were1 dropped from the act and ignored, the provisions of the act could not extend to the area described in Section 3699-8 because the General Assembly never extended the operation of the act to that area and the court is powerless to do so.
 

 The Court of Appeals found, however, that Section 3699-8, General Code, although unconstitutional, does not provide for an exception as to the area described therein but is a limitation as to the operation of the act to territory less' than the whole and that the limitation may be disregarded.
 

 The Court of Appeals laid great stress upon the fact that Section 3699-9, General Code, provides for a separation of any unconstitutional or invalid sections from those which are constitutional and valid, and held that to ignore such a saving clause would be just as much judicial legislation as to ignore what really constitutes the exception if it exists. Its holding as to “limitation” was based upon an excerpt from the opinion of Judge Burke t in the case of
 
 *336
 
 State,
 
 ex rel. Wilmot, v. Buckley, supra.
 
 In the opinion of the writer in the instant case that statement is purely an obiter dictum not carried, into the syllabus or necessary to the judgment in the case.
 

 Although consideration must be given to the fact that an act contains a separability clause, such a clause is not conclusive for the reason that if one section of an act is unconstitutional and its exclusion from the act still leaves such act unconstitutional because the court has not the authority to supply what the General Assembly omitted, the whole act should be declared unconstitutional. However, more than one of the members of this court are of the opinion that the conclusion of the Court of Appeals as to the constitutionality of Sections 3699-a to 3699-7, inclusive, and 3699-9-, General Code, is correct and, therefore, because of the provision in Section 2, Article IV of the Constitution, we cannot hold any of the Fleming Act unconstitutional except Section 3699-8, General Code. We must therefore decide this case with reference to that act.
 

 Sections 3699-o, 3699-1 and 3699-2, General Code, are the only sections of the act with which we are particularly concerned. Section 3699-o is a declaration of the rights of the state and of the littoral owners with reference to the waters of Lake Erie. It declares that the state is the owner of the waters together with the soil beneath and their contents, such ownership being in trust for the people of the state, subject to the powers of the United States government, the public rights of navigation and fishery and the rights of the littoral owners, while those waters remain in their natural state, to make reasonable uses of the waters in front of or flowing past their lands. The section states that any artificial encroachments by the public or private littoral owners, whether in
 
 *337
 
 the form of wharves, piers, fills or otherwise beyond the natural shore line and not expressly authorized by the General Assembly, shall not be considered as having prejudiced the rights of the public in such domain.
 

 It is obvious that this section does not change the concept of the declaration of the state’s title as found in the
 
 C. & P. case, supra.
 

 The littoral owners of the upland have no title beyond the natural shore line; they have only the right of access and wharfing out to navigable waters. That right is a property right although not a tangible one and is subject to the superior right of the state as the owner of title in trust for the people of the state, and of the United States with the authority accruing to it by virtue of its exclusive power over interstate commerce.
 

 Section 3699-1, General Code, delegates to municipal corporations which border on the shore line of Lake Erie the power,
 
 in aid of navigation and ivater commerce,
 
 to construct, maintain, use and operate, or lease the right so to do, piers, docks, wharves, connecting ways, places, tracks and other water terminal improvements with buildings and appurtenances necessary or incidental to such use on any land belonging to such a corporation held under title permitting such use. The section provides also that any such municipal corporation, subject to superior federal legislation, may establish harbor lines and other regulations and prohibit the placing, maintaining or causing or permitting to be placed any unlawful encroachments.
 

 Section 3699-2, General Code, provides that when any of the territory mentioned in Section 3699-1 is in front of privately owned upland and has been filled in or improved by the upland owner or his predeces
 
 *338
 
 sor in title, then the municipal corporation cannot take possession of the filled or improved land without the consent of the upland owner until the municipal corporation has complied with the laws governing the appropriation of private property for municipal purposes, except that in any such proceeding to appropriate there shall be no compensation allowed to the upland owner for the site of such fill or improvements.
 

 What is the meaning of Section 3699--2, General Code?
 

 Sections 3699-a and 3699-1 are concerned with the rights of navigation, water commerce and fishery. Section 3699-1 speaks of piers, docks, wharves, connecting ways, places, tracks and other water terminal improvements with buildings and appurtenances necessary or incidental to such uses. It is obvious that it must follow from the provision in Section 3699-2 that any filled or improved lands in front of the property of the upland owners can be taken without compensation by the municipality, only if the taking is for a purpose in aid of navigation and water commerce, and that if the taking is for any other purpose the upland owner is entitled to compensation for the loss or interference with his right of access to navigable waters or the impairment or destruction of his wharf, piers, docks or other works in aid of navigation and water commerce.
 

 Under the Fleming Act, therefore, if the city builds any work in aid of navigation and water commerce upon filled or submerged land in front of the property of private upland owners it is within its rights and need not compensate the upland owners for either the loss or impairment of their right of access to navigable waters or the impairment or destruction of whatever the upland owners have constructed. In such a case any construction by the upland owners
 
 *339
 
 would be purprestures. Such action on the part of the city would not violate either Section 19, Article I of the Ohio Constitution or the Fifth Amendment to the Constitution of the United States, for the reason that the upland owners have title only to the natural shore line of Lake Erie and a right of access to navigable waters and to wharf out. Although, as stated above, these rights are incorporeal property, they are always subject to the superior right of the United States government under the interstate commerce power and to the title of the state as trustee for the public as to all rights of navigation, water commerce or fishery.
 

 When the state exercises its prerogative on behalf of the public to do anything in aid of navigation, water commerce or fishery, it takes from the upland owner no right.
 

 A quite different situation arises when the state or, by the state’s authorization, a municipal corporation impairs or destroys the right of an upland owner of access to navigable water or a wharf constructed to achieve such access, by the erection or creation of a work not in aid of navigation, water commerce or fishery.
 

 That brings us to the questions the answers to which must control the disposition of this case.
 

 Is there evidence in the record that the fill in front of plaintiff’s upland was' made by plaintiff or its predecessor in title and was intended as a wharf and is a wharf! As we have said, the Court of Appeals held that the findings of the trial court with reference to these questions were against the weight of the evidence and were not sustained by any evidence. The reasoning as to the fill not being made by plaintiff or its predecessor in title is based upon the testimony that both of them did so little in building the fill and
 
 *340
 
 that the part either of them built was so high and inconsiderable that it could be disregarded under the maxim,
 
 cle minimus non curat lex.
 

 The
 
 Court
 
 of Appeals was of the opinion that almost all the fill including all that part which was at wharf level was created by permission granted by plaintiff’s predecessor in title to the city and individuals to dump waste and fill material into the shallow waters in front of plaintiff’s upland property.
 

 The Court of Appeals took the view that as a matter of law such work was not done by plaintiff or its predecessor in title. With this conclusion we cannot agree. If one arranges to have his land filled and some other person does the filling at his own expense and effort and for his own convenience, we are of the opinion that the one whose land is filled can be said to have had it filled for his own use and benefit.
 

 It is a matter of common knowledge that there are innumerable situations where one person owns property which is not of use until it is filled and levelled and another person in the performance of a contract and in the making of an excavation finds it necessary to find a location where he can dump excavated material, and an arrangement is made between the two parties whereby the excavator at his own expense, with his own labor and for his own advantage transports his excavated material and dumps it upon the land of the first party. We are of the opinion that it cannot be held, certainly as a matter of law, that the one on whose land the material has been dumped has neither had it dumped nor is the owner of the waste after it has been dumped.
 

 In the present case there was testimony to be considered that plaintiff and its predecessor in title had the waste material dumped into shallow waters in front of their uplands. If such fill constituted a
 
 *341
 
 wharf, the wharf was as much plaintiff’s property as though it were a structure.
 

 The trial court held that the made land in front of plaintiff’s upland constitutes a wharf appurtenant to such upland and the Court of Appeals held that the made land does not constitute such a wharf. We are of the opinion that there is evidence in the record which makes that question one of fact.
 

 The testimony of plaintiff’s witness, Quail, as to the filling which was done in front of plaintiff’s upland by The Wilson Realty Company, was to the effect that that company controlled the matter of filling and employed a man to stay on the property to see that the filling was properly done; that the company had a permit from the United States government to make the fill into the water; that in 1928 the company gave permission to the city to dump its waste; and that there were negotiations between the city and The Wilson Realty Company during the time of the agitation for the so-called Hopkins plan for the lake front improvement, which plan is claimed to have recognized the rights of the littoral owners in the water front.
 

 Quail testified further that the dumping was done for the dual purpose of wharfing out and making land to be added to the upland. Apparently the same nature of evidence was persuasive in the
 
 C. & P. case, supra.
 
 In the report of that case, on pages 83 and 84, it is said:
 

 “In this case the defendants aver in their answer that the work complained of was and is for the purpose of enabling them to reach navigation and to perform their duties' as common carriers. They insist they have no other object. No other purpose and no other result is allowable. In the absence of legislation by the state touching the'subject and until the enactment of such legislation, this was their right.”
 

 
 *342
 
 This brings us to a consideration of a most crucial phase o.f this case. Is the shoreway, with the extension of the sewer constructed thereunder, an aid to navigation? If it is, then the city had the right to construct it without compensating the upland owners, no matter how much their littoral rights were impaired or even destroyed, for we again repeat that the littoral rights of the upland owners are not titles to land, and though they are property rights they are restricted and limited- and entirely subservient to the power and authority of the state and federal governments in whatever either of them do in aid of navigation, water commerce or fishery. Since we hold that the trusteeship of the state is confined to such objectives, if the shoreway is not an aid to navigation and water commerce, the city did not have the right to construct it without compensating the owners of the uplands for whatever damage the construction did to the littoral rights of such upland owners, as we have defined them.
 

 The trial court held that the shoreway, sewer extension and the connecting roadway with 55th street were not works of the city in aid of navigation and commerce. The Court of Appeals held such finding was against the' weight of the evidence and that the undisputed testimony demonstrated such finding to be erroneous. There was a great amount of evidence offered in connection with this question.
 

 In the ordinances adopted by the city council in 1935 and 1939 authorizing the construction of the shore-way, there was a declaration of intention to establish the lines of such shoreway to a width of 230 feet between East 9th street and East 70th street, making direct access to all piers, docks and wharves then or thereafter constructed on the lake front. In one of such ordinances is this language:
 

 
 *343
 
 ■“The title to the filled land on which said street is to be constructed is in the state of Ohio, the use and development of which
 
 in aid of navigation
 
 is, by statute, given to the city of Cleveland.” (Italics ours.)
 

 When the mayor of the city acted upon the authority given by the ordinance of 1935 he appealed for federal funds on the basis that the shoreway would relieve traffic congestion and provide access to the east from the commercial portion of the city. Nothing was said in his application about the shoreway being in aid of navigation.
 

 The evidence in the record indicates that there had been comparatively little in the way of water commerce developed in the east basin of the harbor, most of the commercial navigation projects having been constructed in the westerly portion. The Universal Terminal Company and the Cleveland Builders Supply Company had docks in the eastern basin and witness Keal, local representative of the Universal Terminal Company, and witness King, superintendent of the Cleveland Builders Supply Company, testified at great length as to the manner in which the shoreway restricted, limited and retarded their commercial water activities.
 

 Although the city claims that such a road as the shoreway had long been contemplated and was contemplated in the Hopkins plan for the city, there is evidence in the record to the effect that, as a matter of fact, the road contemplated in the Hopkins plan was a marginal railroad and truck street with a boulevard as a mere incident. The record shows the shore-way to be a high-speed boulevard on which commercial traffic is discouraged, but which does operate to tremendously relieve the traffic situation of the city.
 

 Although the Court of Appeals found that the un
 
 *344
 
 disputed evidence demonstrated the finding of the trial court to the effect that the shoreway was not in aid of navigation to be erroneous, the court did state in its opinion:
 

 “The evidence does conclusively show that as such roadways are now employed, regulated, and operated, they have little, if any, value to the public of the state of Ohio for uses in aid of navigation, but, on the contrary, are employed as high-speed boulevards permitting rapid transit to and from the congested area of the city of Cleveland.”
 

 It is our opinion that the evidence with reference to the shoreway, construed most favorably to the claims of the city, presents a question of fact upon which the minds of reasonable men may differ. We agree that courts cannot control the discretion of legislative bodies such as a city council and that recitals in an ordinance should not be disregarded; but we cannot agree that such recitals are conclusive to the effect that when the ordinance is in operation the purposes of the recitals are being fulfilled.
 

 As has before been indicated, the Court of Appeals held that the findings of the trial court that the filling in was done by .plaintiff or its predecessor in title, that the fill constituted a wharf, and that the works of the city were not in aid of navigation, were against the weight of the evidence, and the undisputed evidence showed that the contrary to each of such findings of the trial court was true.
 

 The appeal from the trial court to the Court of Appeals was'upon questions of law and therefore the Court of Appeals could not retry the case. Whether conflicting evidence or conflicting inferences from evidence concerning which reasonable minds might differ do or do not sustain a finding by the trier of
 
 *345
 
 the facts is a question for the trial court, and for the Court of Appeals upon an appeal on questions of law. It is not a question for this court, for the reason, which has so frequently-been stated, that the Supreme Court, by statute (Section 12223-31, General Code), is not required to weigh the evidence and when the weight has been passed upon by the trial court and the Court of Appeals, the Supreme Court ordinarily will not weigh the evidence.
 

 Where all the material facts in evidence permit of but one rational inference and reasonable minds cannot differ as to the effect thereof, the decision of the issue in such an instance becomes a question of law for the trial court, the Court of Appeals and the Supreme Court, and the Supreme Court will examine the record to determine such a question of law. We hold that there is conflicting evidence or conflicting inferences to be drawn from the evidence in the matter of the fill in front of plaintiff’s upland, whether such fill constitutes a wharf, and whether the shoreway, connectr ing roadway and extended sewer are or are not aids to navigation and water commerce.
 

 The Court of Appeals has the authority and duty to weigh the evidence and to determine whether the findings of the trial court as the trier of the facts were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial. However, the Court of Appeals did not decide that question but did decide that the effect of all the evidence was that the trial court was in error as a matter of law in making the findings that it did upon the above question.
 

 In the brief of the state of Ohio,
 
 amicus curiae,
 
 the Attorney General, as have other counsel, quotes at length from the landmark case of
 
 Illinois Central Rd.
 
 
 *346
 

 Co.
 
 v.
 
 Illinois,
 
 146 U. S., 387, 36 L. Ed., 1018, 13 S. Ct., 110. We quote a short excerpt from that scholarly and persuasive opinion, at page 452:
 

 “That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States holds in the piublic lands which are open to pre-emption and sale. It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private pjarties. ”
 

 The Attorney General urges that there should not be a narrow construction as to the meaning of navigation, for the reason that in the future scientific progress may well render entirely obsolete the types and methods of water navigation heretofore known and our great inland waterways will become largely useful for other and even more beneficial purposes, and if such progress should be made it would be ridiculous that the dead hand of the past has impressed an irrevocable and inalienable trust upon the resources of the state, limited to obsolete and antiquated public uses.
 

 We are in thorough agreement with that view and firmly believe that the law should be flexible enough to be applied to a constantly progressive civilization, and by this opinion we do not mean to express any limitation with reference to situations as they may
 
 *347
 
 arise in the future. We hold that as to lighthouses, wharves, docks and like instrumentalities there can be no question as to their being aids to navigation; and that as to roads connecting wharves and docks and utilized for commercial purposes, it could be demonstrated that they are aids to navigation; but as to works such as are involved in this case, it becomes a question of fact whether they are aids to navigation and water commerce; and when the trier of the facts has made a finding, if there is substantial evidence to support that finding, the Court of Appeals cannot find otherwise as a matter of law.
 

 It may be argued that the recognition of the littoral rights of the upland owners would impede or retard civic enterprises of the city, but that same argument can be made with reference to property rights in any city or community. If a city desires to develop a public improvement which takes, destroys or impairs property rights of private owners the city must pay for those property rights. There is nothing new in this conception. It is expressed and declared in the Constitution of the United States and the Constitution of Ohio, which great instruments recognize, preserve and protect private rights of individuals, whether those be human rights or property rights.
 

 We hold that the Court of Appeals was in error in finding as a matter of law that plaintiff or its predecessor in title did not fill in the submerged lands in front of its upland, that the filled land did not constitute a wharf and that the shoreway was constructed in aid of navigation and water commerce, and, likewise, in holding that the Fleming Act enabled the city to construct a road across the made land in front of the property of plaintiff and the upland owners, whether or not such road was in aid of navigation and water
 
 *348
 
 commerce, without compensating plaintiff and such owners.
 

 The Court of Appeals had the authority to reverse the judgment of the trial court on the ground that the judgment is “against the weight of the evidence.” This was done. However, a final judgment was rendered by the Court of Appeals and this it was without authority to do inasmuch as a remand to the trial court is necessary when the Court of Appeals reverses a judgment as against the weight of the evidence. This court reverses the judgment of the Court of Appeals and remands the case to the Common Pleas Court for a retrial, which the Court of Appeals under its finding was required to do.
 

 Judgment reversed and cause remanded.
 

 Weygandt, C. J., Turner, Matthias, Hart, Zimmerman and Sohngen, JJ., concur.