JOURNAL ENTRY AND OPINION.
{¶ 1} Plaintiff-appellant, Beach Cliff Board of Trustees, appeals the decision of the Cuyahoga County Common Pleas Court that granted summary judgment to defendants-appellees, John Ferchill, Sharon Ferchill, Kenneth Wessel and Sam Speck, Director of the Ohio Department of Natural Resources, on appellants' amended complaint seeking, inter alia, injunctive and declaratory relief regarding the ownership rights of a strip of beachfront property. John and Sharon Ferchill ("Ferchills") cross-appeal the trial court's decision denying their motion for damages for wrongful temporary restraining order. For the reasons that follow, we affirm.
 {¶ 2} In 1927, the Beach family deeded in trust to the Beach Cliff Board of Trustees ("Beach Cliff") an approximate one-mile strip of land located along the shoreline of Lake Erie in Rocky River for the "sole use and benefit" of owners in the adjoining subdivision. A portion of the trust property is adjacent to the northern border of property owned and/or occupied by the Ferchills and Kenneth Wessel ("Wessel"). The Ferchills obtained a submerged land lease from the Ohio Department of Natural Resources ("ODNR") in order to construct a recreational dock and cement pad and to implement anti-erosion measures. The City of Rocky River ("City") assisted in financing this project and apparently contracted with T-K Engineering and Design Group, Inc. for the project's design.
 {¶ 3} Beach Cliff, claiming that the construction project encroaches on land owned by it, sought injunctive and declaratory relief to prevent this construction project.[1] The Ferchills, Wessel, ODNR and the City claimed that the trust property, or at least that portion north of the Ferchill/Wessel property, has become submerged, thereby vesting title with the State of Ohio. In the motion for summary judgment that followed, the Ferchills argued as much and claimed that it was proper for ODNR to issue a submerged land lease to them and Wessel so that construction could continue. Supporting their motion were: (1) excerpts[2] of the deposition of Scudder D. Mackey, Ph.D., a geologist/supervisor with ODNR; (2) an affidavit[3] of geologist Danielle Foye, also affiliated with ODNR, averring that "a portion of the Ferchill property was lost, became submerged land and was subsequently filled" and that the natural shoreline of the Ferchill property is south of the historic fill; (3) a publication from ODNR entitled SubmergedLands Management outlining Ohio's public trust doctrine and what ODNR considers submerged land; (4) excerpts of the deposition of Robert J. Alban, P.E.[4]; and (5) a letter from Beach Cliff dated April 16, 1998 and addressed to an attorney with the law firm of Baker Hostetler, LLP. Beach Cliff opposed the motion arguing that ODNR was not justified in issuing the submerged land lease because, at the very least, there existed an issue of fact as to whether the land was submerged. The trial court, nonetheless, granted the Ferchills' motion for summary judgment.
 {¶ 4} Based on the trial court's decision in favor of the Ferchills and Wessel, ODNR thereafter moved for summary judgment on Beach Cliff's claim against it for mandamus, which the trial court granted. This appeal and cross-appeal followed.
 I. Appeal {¶ 5} Appellant raises two assignments of error for our review. Because both are directed at the trial court's decision granting summary judgment to the Ferchills, Wessel and ODNR, they will be discussed together. In essence, Beach Cliff contends that summary judgment was inappropriate because R.C. Chapter 1506 does not authorize ODNR to claim ownership of a portion of Beach Cliff's lakefront property and, in turn, lease that property to the Ferchills and Wessel.
 {¶ 6} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Zivichv. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370, citingHorton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, paragraph three of the syllabus; see, also, Civ.R. 56(C).
 {¶ 7} The title to land under the waters of Lake Erie within the limits of the state of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted. State v.Cleveland Pittsburgh Railroad Co. (1916), 94 Ohio St. 61, paragraph three of the syllabus. Codified now at R.C. Chapter 1506, the "public trust" doctrine delineates the property rights of those whose property abuts a lake, otherwise know as littoral owners. Lemley v. Stevenson
(1995), 104 Ohio App.3d 126, 133.
 {¶ 8} "The littoral owners of the upland have no title beyond the natural shoreline; they have only the right of access and wharfing out to navigable waters. That right is a property right although not a tangible one and is subject to the superior right of the state as the owner in title for trust for the people of the state, and of the United States with the authority accruing to it by virtue of its exclusive power over interstate commerce." Id., quoting State ex rel. Squire v. Cleveland
(1948), 150 Ohio St. 303, 337.
 {¶ 9} R.C. 1506.10 governs the state's rights to the waters of Lake Erie and provides, in relevant part:
 {¶ 10} "It is hereby declared that the waters of Lake Erie consisting of the territory within the boundaries of the state, extending from the southerly shore of Lake Erie to the international boundary line between the United States and Canada, together with the soil beneath and their contents, do now belong and have always, since the organization of the state of Ohio, belonged to the state as proprietor in trust for the people of the state, for the public uses to which they may be adapted, subject to the powers of the United States government, to the public rights of navigation, water commerce, and fishery, and to the property rights of littoral owners, including the right to make reasonable use of the waters in front of or flowing past their lands. Any artificial encroachments by public or private littoral owners, which interfere with the free flow of commerce in navigable channels, whether in the form of wharves, piers, fills, or otherwise, beyond the natural shoreline of those waters, not expressly authorized by the general assembly, acting within its powers, or pursuant to section 1506.11 of the Revised Code, shall not be considered as having prejudiced the rights of the public in such domain. This section does not limit the right of the state to control, improve, or place aids to navigation in the other navigable waters of the state or the territory formerly covered thereby."
 {¶ 11} "Territory" is defined as "the waters and the lands presently underlying the waters of Lake Erie and the lands formerly underlying the waters of Lake Erie and now artificially filled, between the natural shoreline and the international boundary line with Canada." R.C. 1506.11(A).
 {¶ 12} In its journal entry granting the Ferchills' motion for summary judgment, the trial court stated:
 {¶ 13} "Despite recent changes to the shoreline, the evidence in the record reveals that both the northern section of the Ferchills' property and [the] Beach Cliff [property] were completely submerged at the time the Ferchills began construction on the erosion control project in 1999."
 {¶ 14} Beach Cliff contends that this conclusion is erroneous. It argues that the evidence is to the contrary or, at the very least, there exists a genuine issue of material fact as to whether the property at issue is submerged. We agree.
 {¶ 15} R.C. 1506.10 designates ODNR as the state agency responsible for the enforcement of the state's rights as set forth in that section and the Ohio Administrative Code establishes many of the guidelines as pertains to the lease of submerged lands. See Ohio Adm. Code 1501-6-01 et seq. Although the latter contains many definitions of the terms necessary for the statute's enforcement, conspicuously absent is any definition of "underlying waters" or "submerged lands." Beach Cliff contends that, as such, there is no support for ODNR's arbitrary assignment of 573.4' or the ordinary high water ("OHW") mark as the elevation from which a determination is made whether land is submerged. As stated previously, attached to the Ferchills' motion for summary judgment was a document entitled Submerged Lands Management, which purports to be a publication of ODNR. Contained within this document is a discussion of Ohio's public trust doctrine, as well as a discussion of boundaries of this "public trust." Under the section discussing the boundaries of the public trust, the document states:
 {¶ 16} "Ohio law uses the term `natural shoreline' to define the boundary of the public trust property (O.R.C. § 1506.11). The [ODNR] follows the common law principal (sic) that the trust property includes the lands below the [OHW] elevation. The federal government conveyed this property, to OHW elevation, to the state of Ohio when the state was organized in 1803. The U.S. Army Corps of Engineers (Corps) has established the OHW elevation for Lake Erie at 573.4 feet, International Great Lakes Datum (IGLD) 1985. This boundary, established administratively by the Corps utilizing long-term water level and climate data, coincides very well with the physical evidence of what is sometimes referred to as the [OHW] mark.
 {¶ 17} "ODNR uses this OHW elevation as the boundary of the Lake Erie trust property in its submerged lands leasing program. It is consistent with the Corps' jurisdictional boundary for regulatory purposes, and is consistent with Ohio case law and Supreme Court decisions. The state of Ohio does not assert this public trust ownership in areas that extend upstream beyond the mouths of Lake Erie tributaries, even though the lake-influenced OHW elevation can often be measured far upstream. Lake Erie's natural shoreline (the boundary of the trust property) does change over time as a result of natural processes such as erosion or accretion. On the other hand, the location of the natural shoreline can also become fixed behind artificial structures or fill placed along the shoreline."
 {¶ 18} This document purports to be a publication of ODNR under an award to the National Oceanic and Atmospheric Administration. It is this document as well as the testimony of Mackey and others upon which the Ferchills rely to establish the OHW elevation of 573.4' as the demarcation point for determining submerged lands.
 {¶ 19} It is true that the trial court did not find this elevation level to be the determinative factor. On the contrary, it found that the definition of submerged land is based upon the location of the natural shoreline. Relying on Foye's affidavit, wherein it was averred that a portion of the Ferchills' property was submerged, the trial court inferred that Beach Cliff's property was similarly submerged. We find such an inference to be unjustified.
 {¶ 20} Even if we were to assume that the OHW elevation of 573.4' is the demarcation point for submerged land, the record before us supports that the parties' evidence is in dispute as to whether the property at issue is below this elevation mark. The documentary evidence appended to the Ferchills' motion confirms that ODNR uses the OHW in determining whether land is submerged and whether a submerged land lease must be issued. Merely because ODNR required a submerged land lease, however, does not support that Beach Cliff's land is similarly submerged. To be sure, Foye averred that "a portion of the Ferchill property was lost, became submerged land" and that ODNR required the Ferchills to obtain a submerged land lease. Mackey testified in deposition, however, that at various times the elevation of the land at issue alternated above and below the OHW mark, that a beach had reappeared at times and that, as such, the Ferchills' property was south of the reappeared beach. The erosion report itself, prepared by ODNR, supports the fluctuations in lake levels. Indeed, it states:
 {¶ 21} "Now the year of 2000, Lake Erie's levels are back to normal, but the lake levels are low compared to the last 30 years. Many beaches and old structures are exposed now and people are trying to reclaim them."
 {¶ 22} In light of Mackey's deposition testimony and ODNR's erosion report, a genuine issue of material fact remains as to whether the land at issue was submerged. This does not end the inquiry, however. Reiterating, R.C. 1506.11(A) includes in its definition of "territory," "lands formerly underlying the waters of Lake Erie and now artificially filled, between the natural shoreline and the international boundary line with Canada." See, also, State ex rel. Squire v. Cleveland (1948),150 Ohio St. 303; State v. The Cleveland Pittsburgh RR Co. (1916),94 Ohio St. 61. It is ODNR's position that, despite any reemergence of the beachfront property, the property has been artificially filled, thereby satisfying the definition of "territory" sufficient for the issuance of a submerged land lease. We agree.
 {¶ 23} The documentary evidence appended to the Ferchills' motion for summary judgment supports the presence of "historic fill." As stated previously, Foye's affidavit makes reference to a portion of the Ferchill property as being "subsequently filled" and that the "natural shoreline of the Ferchill property is to the south of said `historic fill.'" Foye compiled an erosion history and shoreline delineation for several lakefront properties, including the property owned by the Ferchills. In conjunction with her supervisor, Bridget Stefan ("Stefan"), Foye averred that it was ODNR's position that a submerged land lease was required. In Stefan's letter to the Ferchills, she stated that "[d]uring the review, it became apparent that there is historic fill on site" and that "a lease from the State for Lake Erie submerged lands is required for the area occupied by the historic fill." The erosion history report itself is appended to the Foye affidavit, as is the Stefan letter. There are several references contained within that report that support that the fill material had been dumped on the property as early as 1956. A similar reference was made for 1968, wherein it was noted that "[a] large amount of fill and construction rubble was dumped on the north side of property * * *." Over the ensuing years, several references were made to either the appearance or continuation of this fill.
 {¶ 24} Beach Cliff, however, offers no evidence in opposition to this evidence that would be sufficient to create a genuine issue of material fact. To be sure, Beach Cliff argues that ODNR's references to historic fill relate only to the presence of fill on the Ferchill property and not the Beach Cliff property. We disagree. The language in both the Foye affidavit and the erosion report are not so limiting. The documents refer to historic fill on "site" and efforts at artificially filling the several parcels of property that were the subject of the erosion report over the course of forty years. Beach Cliff offers no evidence to support its bald contention that the references to historic fill pertain only to the Ferchill property and we can discern none from our review of the documentary evidence supporting the Ferchills' motion for summary judgment.
 {¶ 25} Consequently, it was not error for the trial court to grant summary judgment to the Ferchills, Wessel and ODNR, although for a reason different than that expressed by the trial court. We find on the record before us that there is no genuine issue of material fact regarding the issue of the presence of historic fill on the site of the beachfront property. This finding satisfies the definition of "territory" contained in R.C. 1506.11 and likewise satisfies the requirements for the issuance of a submerged land lease on land subject to the state's public trust.
 {¶ 26} Beach Cliff's assignments of error are not well taken and are overruled.
 II. Cross-Appeal {¶ 27} In their sole assignment of error on cross-appeal, the Ferchills contend that the trial court erred when it denied their motion seeking damages when Beach Cliff obtained a temporary restraining order.
 {¶ 28} Relying on Berkey Farmers' Mut. Tel. Co. v. The SylvaniaHome Tel. Co. (1917), 97 Ohio St. 67, the Ferchills contend that an order dissolving a temporary restraining order is conclusive evidence that a restraining order was wrongfully entered. Our review of the record, however, does not support that the trial court ever issued a temporary restraining order. The Ferchills append to their appellate brief what appears to be a handwritten "order" as well as excerpts of a transcript of the May 2, 2000 hearing. Neither of these documents are contained within the record, nor does the handwritten "order" appear on the docket sheet from the trial court as a journalized entry. A reviewing court is limited to the record before it and can neither consider nor review matters outside that record. Id.; see, also, McKay v. Cutlip (1992),80 Ohio App.3d 487, 490, fn. 3
 {¶ 29} The trial court has broad discretion to grant or deny temporary restraining orders. Beasley v. East Cleveland (1984),20 Ohio App.3d 370, 374; Benrus Watch Co. v. Weinstein WholesaleJewelers, Inc. (1959), 108 Ohio App. 525, 529. Nonetheless, merely because a trial court may have issued a temporary restraining order that may have expired by its own terms does not require a finding that the party against whom the injunctive relief was granted is entitled to damages. Professional Investigations Consulting Agency, Inc. v.Kingsland (1990), 69 Ohio App.3d 753, 761; see, also, Daniel Constr. Co.v. Internatl. Brotherhood of Electrical Workers, Local 88 (Dec. 10, 1986), 4th Dist. Nos. 1237 1243, 1986 Ohio App. Lexis 9882. On the contrary, the trial court must determine (1) whether the temporary injunctive relief should be dissolved or made permanent, and (2) whether the temporary restraining order was wrongfully issued before it finds a party entitled to such damages. Id. Without the required finding that the restraining order was wrongfully entered, there is no entitlement of damages on the bond. See Consun Food Ind., Inc. v. Fowkes (1991),81 Ohio App.3d 63, 69; see, also, The Richfield Groups, Inc. v. GuranBros. (Nov. 24, 1999), 9th Dist. No. 2748-M, 1999 Ohio App. Lexis 5541. The record contains no such order. Thus, even if the orders relative to the restraining order were part of the record as related by the Ferchills, they would not be entitled to damages under Civ.R. 65(C).
 {¶ 30} The Ferchills' sole cross-assignment of error is not well taken and is overruled.
Judgment affirmed.
COLLEEN CONWAY COONEY, P.J. AND ANTHONY O. CALABRESE, JR., J., CONCUR
[1] The parties claim that the trial court issued an order on or about April 14, 2000 temporarily restraining the Ferchills from constructing on the property as well as an order dissolving that restraining order on May 2, 2000. The record, however, is devoid of any such orders. The record does contain an entry journalized on April 18, 2000 documenting that a hearing was held and that it was continued to May 2, 2000. It further contains a motion by the Ferchills requesting that the court vacate the April 14th restraining order as well as an order journalized April 26, 2000 requiring Beach Cliff to post a $25,000 bond. We are unable, however, to locate any order in the record that actually restrains the use of the property or, although unnecessary, one relative to dissolving that order.
[2] The record does not support that any depositions used in support of the respective motions for summary judgment, or the opposition thereto, have been filed as is required by Civ.R. 32(A) and 56(C). Although the trial court need not consider this documentary evidence, neither party objected to its use, and any error, therefore, is waived. See Stegawskiv. Cleveland Anesthesia Group, Inc. (1987), 37 Ohio App.3d 78, 84.
[3] The affidavit incorporated a letter by Foye's supervisor, Bridget Stefan, as well as an erosion report prepared by ODNR.
[4] It appears from the record that Mr. Alban was formerly an engineer with the City of Rocky River.