Lamneck, J.
The plaintiffs contend that on February 9, 1951, the defendant represented to the plaintiffs that an oil well had been drilled and completed to the first sand on the leasehold in question, which the defendant owned, that a well producing from 50 to 65 barrels a day had been struck, and that the defendant intended to drill 20 feet deeper to a second sand which would increase the flow of oil.
The plaintiffs contend further that relying on said representations, which they allege the defendant knew were false and untrue and made for the purpose of defrauding them, they each invested the sum of $2,500 by check for a one-eighth interest in the lease on February 13,1951.
Both parties agree that the assignments by which plaintiffs acquired their interests were made on February 15, 1951, and forwarded to the plaintiffs in Washington, D. C.
The defendant denies making representations that a well producing from 50 to 65 barrels had been struck on February 9, 1951. He claims that he represented to the plaintiffs that there was a showing of oil on February 9,1951, and that the well would be drilled deeper to produce more oil, but that deeper drilling instead of producing more oil made the well of little or no value because the deeper drilling struck salt water, which made pumping unprofitable.
The evidence in this ease discloses the following:
Some time in January 1951, the plaintiffs were each offered a one-eighth interest in the lease in question for the sum of $2,500. This offer was in the nature of an option. On January 31, 1951, the option was extended by the defendant, by letter, “until the well is drilled in * * * but not until the well is shot or acidized.”
On February 9,1951, the defendant sent plaintiff Mc-Neill the following telegram:
“Have good first pay well. Drilling ahead to second *472 pay. Call me Boles Hotel, Beattyville, Kentucky, tonight. ’ ’
There was a telephone conversation between McNeill, who at all times acted as an agent for plaintiff Cross, and the defendant on February 9, 1951. What was said or what representations were made, if any, over the telephone on that occasion is in dispute. McNeill testified that the defendant in response to his question, “Well what is it producing ?, ’ ’ stated,4 4 W ell, from fifty to sixty-five barrels daily.”
The defendant denied that he ever made such a representation but did say the well appeared to be a 4 4good first pay well. ’ ’
On February 13, 1951, McNeill wrote a letter to the defendant, reading as follows:
“Mr. Cross and I are enclosing herewith our checks for $2,500 each to pay for a one-eighth interest in the 121-acre Bowman lease, with a completed well to the second sand.
“We are forwarding this upon your statement that the well at the first sand showed an estimated 50 to 65 barrels daily and your opinion that the second sand, about 20 feet deeper, would show an increased amount of oil and that the two could be operated together profitably.
“Please let us have full report by wire as soon as you have the well fully tested.”
On February 14, 1951, the well was shot into salt water. The man who shot the well testified that he measured the free oil from the first pay sand by cable and instruments, that the oil backed up in the hole 100 feet, and that such an original find, upon being shot, could produce from 50 to 65 barrels per day or even more.
Russell D. Honshul, who was present during the drilling operations, testified that there was no showing *473 of oil in the well on February 9, 1951, the date of the telephone conversation between McNeill and the defendant when the defendant is alleged to have said to McNeill that the well was producing “from fifty to sixty-five barrels daily.” His testimony on this point was as follows:
‘ ‘ Q. Just to keep in chronological order, back on February 9th, which was Friday before, what was the condition of that well at that time? A. Well, we didn’t have any oil at that time.
“Q. Had you any indication at all? A. No, we was still in the sand. The sand had not become discolored at all.”
The defendant on cross-examination as to McNeill’s letter, transmitting the checks in question, testified as follows:
“Q. So that, Mr. Ledford, when you finally read this letter that said, ‘Upon your statement that the well at the first sand showed an estimate of fifty to sixty-five barrels daily,’ you knew perfectly well that was a complete misapprehension of what could possible be true; it was way off base because there was no production? A. At that particular time there certainly was no production.
“Q. And yet you accepted and allowed that five thousand dollars to remain in the bank and did nothing to clarify the situation when you knew Mr. McNeill had sent the five thousand dollars believing when you had told him there was fifty to sixty-five barrels production daily? A. I don’t think Mr. McNeill ever believed that.
“Q. You have his letter stating that was what the conversation was, that the well at the first sand showed an estimate of fifty to sixty-five barrels daily. How did you interpret the letter, Mr. Ledford? A. I didn’t interpret it at the time by answering it and repudiating it. I grant you that.”
*474 The checks in question were cashed on February 15, 1951.
On February 21, 1951, the defendant wrote McNeill that the well had water, and that it was impossible to tell what the well would make. On March 6, 1951, in another letter to McNeill, the defendant said he was trying to control the water in the well.
The plaintiffs, on March 1, 1951, caused the assignments to be recorded.
There is some testimony in the record about a telephone conversation between McNeill and the defendant, during the latter part of March 1951, relative to an alleged offer of the defendant to return the purchase money of the plaintiffs for a reassignment of their leasehold interests, which the plaintiffs refused. The plaintiffs claim that there was no such offer.
On May 9, 1951, McNeill demanded the return of his money by letter but stated in the letter he did not “question” the “good faith” of the defendant.
There is some evidence in the record to indicate that certain information concerning the well in question was furnished to the plaintiffs by one Kelly Kash, a former business associate of McNeill.
It is claimed by the defendant that the plaintiffs lost their right to rescind because of delay in making a demand and in making known their intentions.
“The power of avoidance for fraud or misrepresentation is lost if after acquiring the knowledge thereof the injured party unreasonably delays manifesting to the other party his intention to avoid the transaction. ’ ’ See Restatement of the Law of Contracts, 921, 923, Section 483, and Parmlee, Admr., v. Adolph, 28 Ohio St., 10.
Whether a party to a contract, after discovering the facts entitling him to rescind, acted within a reasonable time, is a question for the trier of facts. See Parmlee v. Adolph, supra.
*475 The trial court, in its finding of facts made no finding as to delay and it does not appear that this contention was raised in that court.
Where a contract has been procured by fraud, the party defrauded may elect to have the contract set aside and be restored to his original position, or he may sue for damages caused by the fraud of the guilty party. The plaintiffs having offered to reassign their leasehold interests to the defendant on July 14, 1951, and having prayed in this action to be restored to their original positions, the trial court was correct in treating the action as equitable in nature without requiring a trial by jury. Where a defrauded party rescinds a contract and offers to restore what he has received under the contract, he may recover the consideration paid. See Picklesimer v. Baltimore & Ohio Rd. Co., 151 Ohio St., 1, 84 N. E. (2d), 214. Before a party may rescind a contract alleged to have been procured by fraudulent representations and recover the consideration paid by him, he must prove such fraudulent representations by evidence that is clear and convincing.
The necessary elements to be proved to maintain an action to rescind a contract procured by fraudulent representations of a party may be briefly stated as follows:
1. There must be actual or implied representations of material matters of fact.
2. Such representations must be false.
3. Such representations must be made by one party to the other with knowledge of their falsity.
4. Such representations must be made with an intent to mislead a party to rely thereon.
5. Such party must have relied on such representations with a right to rely thereon.
A failure of proof as to any one of these essential elements bars a recovery.
*476 The Court of Common Pleas made a finding of fact sustaining all the material allegations of the plaintiffs’ petitions and finding that the contracts were entered into between the plaintiffs and the defendant by reason of the false representations of the defendant. Its finding of fact reads as follows:
“1. On February 9, 1951, the defendant offered to sell to each of the plaintiffs a one-eighth interest in a certain Wolff county, Kentucky oil lease, which lease was owned by defendant.
“2. On or about February 9, 1951, defendant represented to plaintiff, R. H. McNeill, acting for himself and as agent for plaintiff John W. Cross, that a certain well had been drilled and completed through the first sand on the above described oil lease, and that a commercial well producing an estimated 50 to 60 barrels per day had been struck, and that the defendant intended to drill deeper and was of the opinion that the deeper well would show an increased amount of oil, and that the two could be operated together profitably.
“3. That the defendant knew that such-representation that a commercial well producing an estimated 50 to 60 barrels per day had been struck was false and unwarranted.
“4. That such representation, that a commercial well producing an estimated 50 to 60 barrels per day had been struck was the statement of an existing fact and that the defendant was aware of facts inconsistent with such representation.
“5. That such representation that a commercial well producing an estimated 50 to 60 barrels per day was struck was made by the defendant with the intention that the plaintiffs should rely thereon and that the plaintiffs were justified in relying upon the assurances given them, and did so rely.
“6. That the representation that a commercial well *477 producing an estimated 50 to 60 barrels per day had been struck was a substantial factor in inducing the plaintiffs to remit the sum of $2,500 each to defendant, by check, which checks were deposited to the defendant’s bank account, and which sums he has refused to return to plaintiffs.
“7. The defendant, before he received the benefit of the checks of plaintiffs, by their deposit in his bank and their collection, knew that the well he had drilled did not produce, and could not reasonably be expected to produce, 50 to 60 barrels of oil per day, or any substantial portion thereof.”
The plaintiffs have the burden of proving by clear and convincing evidence the essential allegations of their petitions. Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean cleár and unequivocal. See Merrick v. Ditzler, 91 Ohio St., 256, 110 N. E., 493.
Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See Ford v. Osborne, 45 Ohio St., 1, 12 N. E., 526; Cole v. McClure, 88 Ohio St., 1, 102 N. E., 264; and Frate v. Rimenik, 115 Ohio St., 11, 152 N. E. 14.
The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testi *478 mony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, tbe disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false. See Rice v. City of Cleveland, 144 Ohio St., 299, 58 N. E. (2d), 768,
As in most cases, the evidence is in conflict in this case. The trial judge, having heard the witnesses testify, was in a far better position to evaluate their testimony then a reviewing court. There is substantial evidence in the record upon which he could base his findings of fact. Such evidence, if he believed certain witnesses, was sufficient to produce in his mind a firm belief or conviction as to the plaintiffs’ allegations. Under such circumstances, a reviewing court may not as a matter of law substitute its judgment as to what facts are shown by the evidence for that of the trial court.
If the Court of Appeals had heard this cause de novo, it would have been justified in concluding, from the evidence in the record, that the degree of proof required was not clear and convincing, and that final judgment should be rendered for the defendant. But the Court of Appeals heard this cause as an appeal on questions of law only, because of the failure of the defendant to give the bond fixed by the trial court.
In its judgment entry the Court of Appeals entered final judgment for the defendant because there was “no clear and convincing evidence” justifying rescis-' sion of the contracts, and because the claim of fraudulent representations was “not supported by a preponderance of the evidence.”
Since there is substantial evidence in the record to have warranted the trial court in finding that the proof *479 was sufficiently clear and convincing to support the claim of fraudulent representations and reliance thereon, it must be concluded that the reversal by the Court of Appeals was based on the weight of the evidence.
The second ground in the motion for new trial, filed in the trial court on January 19,1953, reads as follows: “The decree and judgment rendered in favor of the plaintiff and against the defendant is contrary to the manifest weight of the evidence.”
In State, ex rel. Squire, Supt. of Banks, v. City of Cleveland, 150 Ohio St., 303, 82 N. E. (2d), 709, the eighth paragraph of the syllabus reads as follows:
“Where the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn therefrom, both the trial court and the Court of Appeals are authorized and required upon motion to weigh the evidence, but in such a situation the Court of Appeals on an appeal on questions of law cannot as a matter of law find the facts otherwise than as found by the trier of the facts. In such a situation the sole function of the Court of Appeals is to weigh the evidence and either affirm the finding of the trier of the facts or, if such finding be against the weight of the evidence, set it aside and remand for a new trial.”
See, also, Gardner v. Industrial Commission, 148 Ohio St., 141, 73 N. E. (2d), 802.
The Court of Appeals had authority to reverse the judgment of the trial court on the ground that its decree and judgment was contrary to the weight of the evidence and there is sufficient conflict in the evidence to have warranted it in doing so in this case. However, in an action to rescind a contract and to recover the consideration paid, where the plaintiff offers substantial evidence to support his claim of fraudulent representation and reliance thereon sufficient to warrant the trial court in finding that it was clear and convincing, the Court of Appeals has no authority to *480 reverse and render final judgment for the defendant in an appeal on questions of law.
. The judgment of the Court of Appeals is reversed and the cause is remanded to the Court of Common Pleas for a retrial.

Judgment reversed.

Weygandt, C. J., Hart, Zimmerman and Stewart, JJ., concur.
Middleton, J., concurs except as to paragraph three of 'the syllabus.