JOURNAL ENTRY and OPINION
The appellant herein, Joseph Todaro, appeals from his conviction in the Garfield Heights Municipal Court subsequent to a jury trial on one count of assault, pursuant to R.C. 2903.13. For the reasons adduced below, we affirm the judgment of the trial court.
The charge in this case arose out of an incident where the appellant and the victim, Timothy Liguzinski, were involved in an altercation in the men's room at Harry's Steak House on September 24, 1999. Although there were no eyewitnesses to the actual altercation, numerous witnesses testified to the condition of both the victim and the appellant immediately after the incident. The victim had to be treated at a hospital for serious head injuries, as well as a dislocated shoulder, facial abrasions, two black eyes, and chest and abdomen injuries. The appellant was described as unscathed by several witnesses who observed him after the scuffle.
The bad blood between the appellant and the victim arose out of a relationship between the appellant's father, Frank Todaro, and the victim's wife, Tammy Liguzinski. The appellant's father, age fifty-eight at the time of the incident, and the victim's wife, age thirty-four at the time of the incident, had been involved in an approximately six-year long relationship which had ended approximately one year prior to the date of this incident. During this time the appellant's father was the sole provider for Ms. Liguzinski. The relationship apparently terminated when Frank Todaro failed to make good on his promise to leave his wife and marry Ms. Liguzinski.
After Ms. Liguzinski began dating and then married the victim, a pattern of mutual animosity arose between the victim and Frank Todaro. Each party accused the other one of behavior designed to harass and/or intimidate. The victim stated that Frank Todaro would continuously drive up and down the street where he and his wife resided and that he would follow them in his car when they drove around town. Frank Todaro, on the other hand, testified that the victim repeatedly made threatening phone calls to him at home and on his cell phone, and warned other members of the Todaro family that Frank would be hurt if he did not stop pursuing Tammy. What is known is that the victim called Frank Todaro's house shortly before the incident and spoke to Mrs. Todaro, informing her of Frank's relationship with his wife and requesting that Mrs. Todaro prevail upon Frank to cease attempting to contact Tammy Liguzinski. It is uncertain whether this phone call from the victim to Mrs. Todaro was the first time that she learned of her husband's six-year liaison with Tammy Liguzinski.
After breaking up with Frank Todaro, Tammy Liguzinski was forced to get a job, as she was no longer being supported by Frank. In August of 1999, the month before the incident in this case, Ms. Liguzinski obtained employment at the aforementioned Harry's Steak House as a bartender/waitress. Prior to September 24, 1999, Frank Todaro visited Harry's on a couple of other occasions on evenings when Tammy was working. In one such instance, on or about September 17, 1999, when the victim was also present, Frank claimed that the victim stared in a menacing fashion at his group's table during the entire course of their visit. The appellant was also present with his father on this earlier occasion, but claims not to have noticed the victim's staring, although every other person at the table testified that this behavior and its intended effect were glaringly obvious.
On September 24, 1999, the appellant, his father and an entourage of family, friends and acquaintances returned to Harry's, apparently unphased by the prior week's tensions. The group was once again waited on by Tammy Liguzinski. The group put in their usual order of salads all around with sodas and grapefruit juices. Allegedly, no one in the group ever drank alcoholic beverages, even though they often frequented restaurants and taverns together.
At around 8:00 p.m, the victim arrived for the stated purpose of picking up his wife who was scheduled to be relieved from her shift at 8:30 p.m. The victim took a seat at the bar and decided to have a couple of beers while he was waiting for his wife to get off of work. While he was at the bar, the victim noticed the Todaros and the rest of their group sitting at a table on the bar side of the restaurant. Tammy Liguzinski stated that during the time period that her husband was at the bar, she was told by Frank Todaro if my husband keeps it up that he will be hurt.
At some point after having consumed a couple of beers, the victim got up from the bar to use the men's room. The appellant happened to heed nature's call almost immediately thereafter. When the appellant entered the bathroom, the victim was using a stall and there was a busboy washing his hands at the sink. The appellant waited for the busboy to finish and then was kind enough to hold the door open for him to exit the room. At this point only the victim, who was still in the stall with his back to the door of the stall, and the appellant remained in the room.
From this juncture forward, the victim and the appellant present radically different versions of the events. According to the victim's testimony, he was standing in the stall, zipping up his pants when the stall door, which he stated was closed but not locked, flew open. At this point the victim states that he felt several blows about the area near the back of his head. The victim further testified that he then fell to ground in the space between the toilet and the stall wall at which time the appellant stomped and kicked him in the face repeatedly. The victim stated at trial that it was at this point that he lost consciousness and that the next thing he remembers is coming to on the bathroom floor in a pool of blood with several people standing over him.
The appellant alleged that it was the victim and not he who provoked the altercation. According to the appellant, the victim first confronted him in the bathroom as they were both standing outside of the stall from which the victim had already exited. The appellant states that he then calmly asked the victim why he was bothering his family, at which point the victim allegedly responded with both an epithet and by attempting to scratch the appellant's face. The appellant testified that in response to the victim's aggression he shoved him backward into the stall causing the victim to hit his head on the back wall of the stall. The appellant's version of events continues with the combatants embraced in a bear hug crashing into walls and with the victim managing to get his foot caught in the toilet. The appellant, who is six foot five and weighs 250 pounds, attempted to explain the victim's injuries by stating that he unintentionally fell on top of the victim when his (the appellant's) bum knee gave out. Despite the numerous very serious injuries sustained by the victim, the appellant denies that he at any time punched or kicked the victim.
After the altercation subsided, the appellant exited the bathroom and walked out the door of the restaurant, got into his car and drove off. Each independent witness who testified stated that the appellant had no blood or cuts on his face and that his shirt was not torn as he exited the bath room, testimony which directly contradicts the appellant's version of events. The appellant testified that although the victim was lying on the bathroom floor and that his eyes were rolled towards the back of his head, it did not occur to him to stick around to discuss the incident with restaurant management or law enforcement officials.
One of the investigating officers was given the cell phone number of Frank Todaro by Tammy Liguzinski. The officer called Frank Todaro in an effort to get in touch with the appellant. Although the appellant was living at home with his parents on the day in question, Frank Todaro told the officer that he did not know where the appellant lived and that he did not have a phone number where the appellant could be contacted for questioning.
Four days later, on September 28, 1999, the appellant, accompanied by his father and his attorney, appeared at the Independence Police Department. The appellant tried to convince the detective assigned to the case that he was not the aggressor by offering a ripped shirt as evidence and by claiming that the scratches on his face were caused by the victim. The detective told the appellant that the shirt had no value as evidence because four days had passed since the altercation at Harry's. At trial the detective testified that the scratch marks looked like they had been caused by someone running a paper clip or other sharp object down the appellant's cheeks and that the marks were too straight and/or uniform to have been incurred during the course of a fight. After interviewing the appellant in the presence of his attorney, the detective charged him with assault, a violation of ORC 2903.13.
The case came on for trial on March 29, 2000. On March 31, 2000, the jury found the appellant guilty as charged of assault. The trial court sentenced the appellant to 180 days in jail, with thirty days suspended, and a fine of $1,000, with $750 suspended. The trial court also placed the appellant on three years of active probation. He was ordered not to travel within one mile of the Liguzinskis' home or places of employment. He was ordered to undergo a psychiatric examination upon his release from jail and to follow all of the recommendations of the report prepared in conjunction with the exam.
The appellant timely filed the within appeal from the jury verdict as well as from several evidentiary rulings made by the trial court. The appellant presents a total of three assignments of error for this court's review. The first assignment of error states:
 I. THE TRIAL COURT ERRED IN NOT PERMITTING APPELLANT TO INTRODUCE CHARACTER EVIDENCE OF THE VICTIM PURSUANT TO 404(A)(2).
During trial the appellant attempted to introduce evidence of two incidents, which each occurred after the September 24, 1999 melee at Harry's, wherein the victim had allegedly either engaged or threatened to engage in domestic violence against his wife. The trial court ruled that this evidence was not admissible under Evid.R. 404(A)(2) because the evidence was not relevant to whether the appellant subjectively believed that the victim had violent propensities at the time of the encounter at Harry's.
Evid.R. 404 (A)(2), "Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes," provides:
 (A) Character evidence generally Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:
* * *
 (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecution for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.
* * *
Evid.R. 405, "Methods of Proving Character," provides:
(A) Reputation or opinion
 In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
(B) Specific instances of conduct
 In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.
 This court in applying Evid.R. 404(A)(2) and 405, has stated, [a] defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct which were known to the defendant in order to establish the defendant's state of mind. (Emphasis sic.) State v. Rogers (Aug. 17, 2000), Cuyahoga App. No. 76601, unreported. See, also, State v. Allen (Nov. 30, 2000), Cuyahoga App. No. 76672, unreported, citing State v. Spinks (Cuyahoga, 1992), 79 Ohio App.3d 720, 730, 607 N.E.2d 1130.
The evidence excluded by the trial court related to instances of alleged domestic violence involving the victim and his wife which each occurred after September 24, 1999. This evidence was properly excluded because the victim's character is not an essential element of the claim of self-defense and the specific conduct sought to be admitted could not have been known to the accused on the day in question. State v. Spinks, supra; State v. Carlson, supra; Evid.R. 404(A)(2) and 405(B).
This assignment of error is hereby overruled.
The appellant's second assignment of error states:
 II. THE TRIAL COURT ERRED IN NOT CONDUCTING A THOROUGH INVESTIGATION AS TO WHETHER OR NOT THE WITNESS, TAMMY LIGUZINSKI, HAD BEEN INTIMIDATED.
Contrary to the appellant's assertion in this assignment of error, the trial court did conduct a thorough investigation into the allegation that Tammy Liguzinski had been intimidated into altering her testimony. Prior to trial, the trial court conducted a voir dire of Ms. Liguzinski to attempt to discern whether she had been intimidated or coerced in any manner. The witness repeatedly stated that she had not been intimidated or threatened in any manner and that she would be truthful. The trial court gave appellant's counsel an opportunity to ask further questions of the witness. Appellant's trial counsel stated on the record that he had no other questions for the witness and that he was satisfied with the trial court's voir dire.
Again, during trial and prior to the testimony of Ms. Liguzinski, the trial court inquired of defense counsel as follows:
 THE COURT: As I had indicated in yesterday's proceedings, the defendant had filed a motion to dismiss, motion for a hearing, or in the alternative, motion to extend time relating to the possible tampering of the testimony of Tammy Liguzinski. It's my understanding that that motion is being withdrawn? MR. DUGGER: That's correct, Your Honor, based on the present circumstances and this court's voir dire of the witness.
It is inconsistent and disingenuous for the appellant to now contend that the investigation was not thorough after expressing satisfaction with the trial court's questioning of the witness prior to trial, and withdrawing his motion during the trial. Clearly, any error that might have occurred in connection to this assignment of error was waived.
This assignment of error is hereby overruled.
The third assignment of error states:
 III. THE JURY ERRED AS ITS VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN FINDING THE DEFENDANT GUILTY.
Article IV, Section 3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial. State ex rel. Squire v. City of Cleveland (1948), 150 Ohio St. 303, 345.
The standard employed when reviewing a claim based upon the weight of the evidence is not the same standard to be used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions in Tibbs v. Florida (1982),457 U.S. 31, where the Court held that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal; i.e., invocation of the double jeopardy clause as a bar to relitigation. Id. at 43.
Upon application of the standards enunciated in Tibbs, the court in State v. Martin (1983), 20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The Martin court stated:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence.
 Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. Hence, we must accord due deference to those determinations made by the trier of fact.
Our review of the record leads us to the conclusion that the jury did not clearly lose its way so as to create a manifest miscarriage of justice, as the overwhelming weight of the evidence was consistent with the finding of guilt.
The appellant's own testimony was completely lacking in credibility. The appellant consistently denied hitting, punching or kicking the victim. At one point he stated that to the best of his recollection he did not punch the victim. At the end of his testimony he stated that if he had been the victim and had been laying on the ground I would have got up and took my beating like a man and walked out. Which beating is it that the appellant refers to if he never punched or kicked the victim.
This court has reviewed the pictures of the victim's injuries taken by the Independence Police Department. The appellant's account of how these injuries came about is simply not credible. The police officer who first responded to the scene stated that upon his entrance into the bathroom he found a party in there with a severe head wound. The officer immediately called 911 due to the serious nature of the injuries.
One of the restaurant employees who discovered the victim lying on the bathroom floor described the scene that he encountered as follows:
 I opened the door and the guy was laying on the floor and there was blood all over the floor, and his foot was like in the toilet, like, basically, he was his eyes were in like the back of his head and he was having trouble breathing. It sounded like he was like, you know I don't know, cardiac arrest or whatever. I don't know what it * * * it didn't sound right.
 He just did not look right, it didn't sound right, and there was just the blood, it was everywhere. It was all over the floor. And it just looked like he was hit from behind the way he was laying on the ground.
The victim was savagely mauled, beaten and pummeled. The appellant's version of the scuffle squarely contradicted the evidence presented to the jury. It is reasonable that the jury would discount the appellant's testimony that he did not provoke the incident and that he was merely acting in self-defense.
Other evidence that the jury could have considered in reaching its verdict includes the fact that the appellant fled the scene and did not resurface for four days. The evidence established a nine year age differential and an enormous size differential between the victim and the appellant. Frank Todaro obviously lied about the appellant's whereabouts to the police on the night of the incident. Additionally, the jury heard testimony from the investigating detective that he believed that the scratch marks on the appellant's face were not authentic and were probably self-inflicted for the purpose of creating an alibi. In addition, three eyewitnesses stated that there were no marks on the appellant's face and that his shirt was not ripped at the time he exited the restaurant.
Thus, for the foregoing reasons and based on our review of the entirety of the record, we conclude that the jury's verdict was not against the manifest weight of the evidence. This assignment of error is overruled.
 _________________________ MICHAEL J. CORRIGAN, P.J.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Garfield Heights Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.