JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant herein, David Ayers, appeals from his convictions in the Cuyahoga County Court of Common Pleas on one count of aggravated murder, one count of aggravated burglary and one count of aggravated robbery, subsequent to a trial by jury. Because we find that the jury verdicts are consistent with the evidence adduced at trial and because we are unable to find prejudicial error in the record, we affirm the verdict.
{¶ 2} The victim in this case, Dorothy Brown, was seventy-six years old at the time that she was murdered. The victim was a resident of the LaRonde apartment complex on Shaker Boulevard in Cleveland. The LaRonde apartment complex is a facility which was owned and managed by the Cuyahoga Metropolitan Housing Authority (CMHA) and which primarily serves elderly and disabled residents. The victim's body was discovered at approximately 2:45 p.m. on the afternoon of December 17, 1999 and showed signs of numerous serious injuries including a fractured skull, trauma to the brain, fractures of the face, a broken finger on each hand as well as multiple bruises and scrapes. The coroner's assistant who testified at trial stated that there were a total of 24-27 different wounds enumerated in the autopsy report. Several of these wounds were characterized as defensive wounds, most likely received by the victim while trying to fend off an attacker. Although the victim was discovered nude from the waist down laying on the floor of her apartment, there were no signs that a sexual assault had occurred.
{¶ 3} There were signs of robbery at the scene, including the victim's emptied handbag which was found on the recliner where she was most likely sitting immediately prior to the assault, as well as an undetermined amount of cash which was known to be in the apartment which was missing. There were no signs of any forced entry into the victim's apartment such as a damaged doorjamb or pry marks in the vicinity of the doorway or the lock, although there was testimony that the door had been locked prior to the time of the assault.
{¶ 4} The appellant, although not elderly or disabled, was also a resident of the LaRonde apartments. The appellant was employed by CMHA as a special police officer (SPO), the function of which is to provide security at CMHA complexes. As part of his compensation for serving as an SPO, the appellant was permitted to live at the LaRonde apartments for a reduced rent of approximately $50 per month. This program was adopted by CMHA to provide additional security and law enforcement visibility at CMHA buildings.
{¶ 5} It is not disputed that the appellant knew the victim fairly well as the result of providing security in the building and that he had been in her apartment on several occasions prior to December 17, 1999. It is also not disputed that in the early morning hours of December 17, 1999, at approximately 2:00 a.m., the appellant, accompanied by another resident of the complex, went to the victim's apartment for the purpose of assisting her from off of the floor where she had fallen and had been unable to get up. This other resident was Sarah Harris, who the next afternoon discovered the victim's body when she went to check on the victim. At the time that Harris discovered the victim's body, the door to the victim's apartment was closed but not locked.
{¶ 6} The Cleveland police were notified of the apparent homicide at 2:44 p.m. on December 17, 1999 and responded to the scene at approximately 3:13 p.m. At the time that law enforcement initially responded, the appellant was observed outside of the victim's unit on the fifth floor of the complex (the appellant lived on the first floor) with a group of other residents, as well as in the building lobby, in a highly agitated state. One of the officers who testified at trial stated that the appellant was bawling sporadically in the lobby of the building during the time period in which police initially responded to the scene and that his hands were extremely shaky while answering questions.
{¶ 7} During the time period following December 17, 1999, investigators obtained the phone records of the victim and the appellant as well as several other individuals who had either made phone calls to or had received phone calls from either the victim or the appellant. The victim's phone records, as testified to by a custodian of the records for Ameritech at trial, showed that she had not made or received any phone calls between 6:00 p.m. on December 16th to 3:00 p.m on December 17th. This information was inconsistent with the testimony of several witnesses who testified at trial.
{¶ 8} The phone records relating to appellant's home phone showed that he received two phone calls from a Kenneth Smith on December 17th. The first phone call, which was made at 12:11 p.m., lasted approximately fifty-one seconds. The second phone call, which was made at 1:54 p.m., lasted for almost sixty-seven minutes. Smith testified at trial that the appellant told him about the murder of Ms. Brown during the course of these phone calls and that he seemed to be extremely upset. This testimony was significant because both of the phone calls were made prior to the time that the victim's body was discovered in her apartment and prior to the arrival of police officers on the scene.
{¶ 9} After the commencement of trial, the state learned of the identity of an additional witness. This witness, Donald Hutchinson, was an inmate at the Cuyahoga County Jail and had been assigned to the same pod as the appellant. Hutchinson testified that after initially denying responsibility for the crime, the appellant, after propositioning Hutchinson for oral sex and offering to give him a massage, confessed that he had in fact killed the victim. According to Hutchinson's testimony, the appellant told him that he returned to the victim's unit in the early morning hours of December 17, 1999 with the intention of stealing money from the victim. Hutchinson further stated that the appellant told him that he killed the victim when she woke up and threatened to turn him in for being in her apartment and for stealing the money. According to Hutchinson, the appellant told him that the murder weapon was a small, black iron that was located in the vicinity of the recliner where the victim was positioned.
{¶ 10} During the relevant time period in question, Hutchinson was in prison on charges of passing bad checks and for a probation violation arising out of additional incidents of financial misconduct, theft and dishonesty. Hutchinson's entire criminal history, as well his possible motivations for testifying, were placed before the jury both on direct and cross-examination.
{¶ 11} Trial commenced on November 17, 2000. The case was completed and was given to the jury on December 6, 2000. The jury eventually returned a guilty verdict on all counts. At one point during deliberations the jury indicated to the court that they were deadlocked, causing the court to give a Howard instruction. The jury returned its verdict on December 11, 2000.
{¶ 12} The appellant was sentenced to a term of twenty years to life on the aggravated murder count, ten years on the aggravated burglary count and ten years on the aggravated robbery count each term to be served consecutively. The appellant timely filed the within appeal from the verdict and the sentence of the trial court. The appellant presents a total of eleven assignments of error for this court's review. The first two assignments of error, which are interrelated and have a common basis in law and fact, state:
 {¶ 13} "I. THE PROSECUTING ATTORNEY VIOLATED MR. AYERS' CONSTITUTIONAL RIGHTS UNDER ARTICLE ONE, SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN HE WITHHELD EXCULPATORY EVIDENCE REGARDING DARREN WARD."
 {¶ 14} "II. THE PROSECUTING ATTORNEY VIOLATED MR. AYERS' CONSTITUTIONAL RIGHTS UNDER ARTICLE ONE
SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HE WITHHELD EXCULPATORY EVIDENCE INVOLVING JERRET WARD."
{¶ 15} The record fails to support the appellant's assertions either that any exculpatory evidence existed in connection with either Darren Ward or Jerret Ward, whom the appellant maintains should have been considered suspects, or that any such "exculpatory" evidence was ever wrongfully withheld. Additionally, the record demonstrates that the appellant's trial attorneys learned of the alleged exculpatory evidence prior to trial and were able to question relevant witnesses concerning the alleged activities of Darren and Jerret Ward.
{¶ 16} Essentially, the appellant alleges in these assignments of error that it was error for the state not to divulge that the investigating officers had followed up on some leads concerning the Wards because one of them had a sexual offense conviction in 1990 and there were complaints that the two men had been breaking into units throughout the building.
{¶ 17} The allegation that Darren Ward's prior sexual offense conviction was "exculpatory" evidence in the instant case is a complete red herring as the assistant coroner who performed the autopsy on the victim testified that there was no evidence of any sexual assault, and there was no other testimony or evidence at trial on this issue. The following exchange occurred at trial during the direct examination testimony of Dr. Frank Miller of the Cuyahoga County Coroner's Office:
 {¶ 18} "Q: Dr. Miller, have you on prior occasions had the opportunity to autopsy victims of a homicide who (sic) have been sexually assaulted as well?
{¶ 19} "A: Yes.
 {¶ 20} "Q: And did you during the course of your examination conduct an examination in regards to this victim in connection with a sexual assault?
{ 21} "A: Yes.
{¶ 22} "Q: And what was your finding?
 {¶ 23} "A: The external examination revealed that there were no bruises, tears or scrapes to the genitalia. The internal examination revealed no injuries to the vagina. As a way of testing I placed swabs within the cavities of the body, oral and rectal and vaginal swabs were all tested and slides were made that I reviewed. There was no sperm seen in the slides, there was no sign of injury or forcible sexual assault by (sic) my exam."
{¶ 24} As to the rumors that one or both of the Wards were breaking into tenants' apartments, the manager of the apartment building, Nefertiti Diggs, testified that she had been assigned to the LaRonde apartment building since April of 1999 and there had been no complaints of break-ins committed by these two persons from the time that she was hired until the time that the victim was murdered. On cross-examination Ms. Diggs was specifically asked by defense counsel whether she was aware of any complaints concerning Darren Ward or his brother and whether she had contacted authorities in connection therewith. Ms. Diggs responded "no because * * * it happened before I came. I heard about it once I got there."
{¶ 25} Prior to trial, the trial court ordered that the prosecutor's file be made part of the record in response to some questions concerning the alleged failure of one or more officers to disclose an alleged incriminating statement made by the appellant. It was from a review of this file that the existence of the purported exculpatory evidence concerning the Wards was first learned of by defense counsel. This court has also reviewed the subject file and in so doing has concluded that the information concerning the Wards was fully followed up by the investigating detectives and determined to be without merit. Darren Ward was interviewed by homicide detectives on February 23, 2000 and subsequently ruled out as a suspect.
{¶ 26} In Brady v. Maryland (1963), 373 U.S. 83, the United States Supreme Court held that the state provide favorable evidence to a defendant which is material either to his guilt or to his punishment. The proper test for materiality is whether the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley (1985), 473 U.S. 667. This court does not believe that the state was obligated to provide information concerning the Wards' status as suspects as it was neither material nor exculpatory. A defendant does not have the right to the names of those persons whom the state at one time considered to be suspects. State v. Spirko (1991),59 Ohio St.3d 1, 26; Crim.R. 16(B)(2).
{¶ 27} In this case, the evidence allegedly not disclosed was presented prior to trial and was fully explored by defense counsel. Accordingly, there is no Brady violation herein. State v. Green (2000),90 Ohio St.3d 352, 372.
{¶ 28} Assignments of error one and two are hereby overruled.
{¶ 29} Assignments of error three, four and five, which are interrelated and have a common basis in law and fact, state:
 {¶ 30} "III. THE TRIAL COURT ERRED WHEN IT ALLOWED AN INCRIMINATING STATEMENT THAT WAS WILLFULLY SUPPRESSED BY THE PROSECUTOR TO BE ADMITTED AT TRIAL AND THE PROSECUTING ATTORNEY VIOLATED MR. AYERS' CONSTITUTIONAL RIGHTS UNDER ARTICLE ONE, SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HE KNEW, YET FAILED TO DISCLOSE, THAT MR. AYERS' INCRIMINATING ORAL STATEMENTS WERE MADE TO DETECTIVES CIPO AND KOVACH."
 {¶ 31} "IV. THE PROSECUTING ATTORNEY VIOLATED MR. AYERS' CONSTITUTIONAL RIGHTS UNDER ARTICLE ONE
SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HE ENGAGED IN IMPROPER CLOSING ARGUMENT BASED UPON FACTS NOT IN THE RECORD."
 {¶ 32} "V. THE PROSECUTING ATTORNEY VIOLATED MR. AYERS' CONSTITUTIONAL RIGHTS UNDER ARTICLE ONE SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION THROUGH THE COLLECTIVE EFFECT OF HIS DECISION TO SUPPRESS EVIDENCE."
{¶ 33} In these assignments of error the appellant alleges that the prosecuting attorney willfully suppressed evidence and that he engaged in speculative arguments during closing arguments which were not supported by the evidence. Initially, we note that although there were undoubtedly discovery snafus in this case leading up to trial, the evidence does not support the appellant's assertion that the lead prosecutor willfully suppressed evidence.
{¶ 34} The incriminating statement at issue in the third and fifth assignments of error was allegedly made to Detective Kovach by the appellant as he was being booked and was to the effect of "if I tell you I beat her can I go home?" During the discovery process and prior to trial, it was disclosed to appellant's attorneys that this statement had been made by the appellant to Sergeant Christopher Jakubs of the CMHA police force during a break in interrogation of the appellant by Cleveland homicide detectives on March 14, 2000. On this day the appellant had been escorted to Cleveland Police headquarters by Sergeant Jakubs. Appellant had been on duty immediately prior to coming in for questioning and was wearing his uniform as well as a service revolver. Although Jakubs escorted the appellant down for questioning, the appellant was not placed under arrest by Jakubs and he voluntarily appeared for questioning. As the appellant was being interrogated by Detectives Denise Kovach and Michael Cipo of the Cleveland Homicide Unit, he requested that he be permitted to speak with Sergeant Jakubs outside of the presence of the two detectives. This request was granted by the detectives. It was during this conversation with Jakubs that the appellant purportedly first asked whether he could go home if he admitted that he hit the victim. This statement was memorialized by Sergeant Jakubs in a report he prepared for his supervisor on the same day, March 14, 2000, and was eventually given to defense counsel pursuant to a discovery request prior to trial.
{¶ 35} During a suppression hearing immediately prior to trial, but before a jury had been called, it was learned during the course of a suppression hearing that essentially the same statement made to Sergeant Jakubs by the appellant had soon thereafter been made to Detectives Kovach and Cipo as they were preparing to book the appellant. Detectives Kovach and Cipo did not note that this statement was made in any of their reports and did not mention the fact that this statement was made to them, as well as to Sergeant Jakubs, to the prosecuting attorney until shortly before trial.[1]
{¶ 36} The appellant's counsel moved to suppress any testimony from the two detectives concerning the statement made by the appellant as to whether he could go home if he admitted to hitting the victim. The trial court, while noting its displeasure with the timing of the release of this information, found that there was no prejudice to the appellant because his counsel admitted that they were not interested in a continuance as a discovery sanction as no amount of additional time would assist them in countering the alleged prejudicial effect of the admission into evidence of the allegations by the two detectives that such an incriminating statement was made. The court also found that any prejudicial effect was significantly lessened by the fact that statement was nearly identical to the one made to Sergeant Jakubs of which appellant's counsel was already aware. Specifically, the trial court stated in making its ruling:
 {¶ 37} "Mr. Shaughnessy, I understand that you are upset about the turn of events, but you are asking me to essentially issue a sanction and strike specifically regarding the second statement, which is the same statement you did have knowledge of. And I agree with Mr. Mahoney that he did not testify and quite frankly to ask me to rely on the statements of police officers, who, for the record, have been highly uncooperative by not appearing when told by the state, I think that is asking too much of this Court. That's the only evidence before me. I don't think that's sufficient evidence to hold it against the state as a discovery violation.
 {¶ 38} "Additionally, you have admitted that a continuance of any length of time would not help you in this and so you've essentially told me, as Mr. Mahoney has said, that there is no remedy for you because it is essentially the same statement. If the statement were different, if the content were substantially different, then I would agree with you about the prejudice, but I do not agree with you on that and so the statement will be permitted." (Emphasis added.)
{¶ 39} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. Because we conclude that the trial court was correct in its determination that the prejudice to the appellant from the admission of the statements at issue was minimized by the fact that it was a statement already alleged to have been made by the appellant to another prospective witness and because appellant's counsel admitted that they would not be aided by the less restrictive discovery sanction of a continuance, we find no abuse of discretion in the trial court's failure to suppress these statements.
{¶ 40} We are also not persuaded by the appellant's contention that the prosecutor willfully "suppressed" evidence. During a suppression hearing prior to trial, the prosecutor offered to allow the trial judge to view his entire file during an in camera inspection so as to make a determination of whether evidence was purposefully withheld. The prosecutor's file in question was eventually made part of the record. Although the prosecutor and defense counsel clearly had some disagreements as to what evidence was exculpatory and/or material, there is no evidence in the record of purposeful suppression by the prosecutor or resulting prejudice to the appellant.
{¶ 41} In regard to the alleged improper statements made during closing arguments, the appellant's counsel failed to object and thus waived all but plain error. State v. Hartman (2001), 93 Ohio St.3d 274,282. We find no plain error because it is apparent that the remark complained of was inconsequential and could not have resulted in prejudice to the appellant. This remark consisted entirely of the prosecutor stating that none of the jurors had been familiar with the case prior to trial from television or newspaper coverage.
{¶ 42} Plain error will not be recognized unless the outcome of the trial clearly would have been different, but for the error. State v. Hickman (Oct. 25, 2001), Cuyahoga App. No. 78998, citing to State v. Long (1978), 53 Ohio St.2d 91. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. Id. Because we cannot conclude that the outcome of the trial below would have been different had the prosecutor not made an isolated remark about the lack of media coverage during closing arguments, we find no plain error.
{¶ 43} The appellant's sixth assignment of error states:
 {¶ 44} "VI. MR. AYERS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL UNDER THE UNITED STATES CONSTITUTION AND HIS RIGHT TO ASSISTANCE OF COUNSEL UNDER ARTICLE I SECTION 10 OF THE OHIO CONSTITUTION WHEN THE TRIAL COURT PERMITTED DONALD HUTCHINSON, AN UNDERCOVER JAILHOUSE INFORMANT, TO TESTIFY REGARDING A CONVERSATION WITH MR. AYERS THAT OCCURRED AFTER A MEETING WITH CLEVELAND POLICE, BECAUSE AFTER THE MEETING HUTCHINSON BECAME AN "AGENT" FOR THE STATE."
{¶ 45} The appellant concedes in the portion of his appellate brief devoted to this assignment of error that he has no evidence that Donald Hutchinson was "instructed" by the state "to obtain a confession from the appellant." Appellant's appellate counsel states in the brief filed with this court that "[a]lthough the Public Defender has yet to prove that Hutchinson was initially deliberately placed in Mr. Ayers' pod he was certainly `set on his course' by Cipo and Kovach at approximately 5:00 p.m. November 25, 2000." There is absolutely no evidence in the record to support this contention that Hutchinson was instructed by Detectives Cipo and Kovach to ask certain questions of the appellant in an attempt to elicit a confession. Hutchinson, Cipo and Kovach each expressly testified that no such instructions were ever given. Hutchinson further stated that he was not the instigator of his conversations with the appellant and that the appellant freely and openly volunteered the information testified to by Hutchinson.
{¶ 46} This court is obligated to limit its scope of review to those facts actually contained in the record and must accordingly decline appellant's counsel's invitation to engage in unfounded speculation and conjecture as to what "instructions" may have been given to Hutchinson. Accordingly, this assignment of error is overruled.
{¶ 47} The appellant's seventh assignment of error states:
 {¶ 48} "VII. APPELLANT AYERS' CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10, TO THE OHIO CONSTITUTION."
{¶ 49} In State v. Jenks (1991), 61 Ohio St.3d 259, the Ohio Supreme Court re-examined the standard of review to be applied by an appellate court when reviewing a claim of insufficient evidence.
 {¶ 50} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" State v. Jenks, supra, paragraph two of the syllabus.
{¶ 51} A judgment will not be reversed upon insufficient or conflicting evidence if it is supported by competent credible evidence which goes to all the essential elements of the case. Cohen v. Lamko (1984), 10 Ohio St.3d 167. Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. State v. Nicely (1988),39 Ohio St.3d 147. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass (1967), 10 Ohio St.2d 230.
{¶ 52} The appellant fails to articulate in his brief which of the counts on which he was convicted for which he believes that the state failed to present sufficient evidence. App.R. 16(A)(7) requires that an appellant present arguments containing the contention of the appellant with respect to each assignment of error together with citations to authorities and the parts of the record upon which the appellant relies.
{¶ 53} From our review of the record it is apparent that there was competent, credible evidence presented to the jury as to all of the essential elements of the case. Much of this evidence has already been reviewed in this opinion. Accordingly, this assignment of error is overruled.
{¶ 54} The appellant's eighth assignment of error states:
 {¶ 55} "VIII. THE CONVICTION AGAINST DAVID AYERS IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE WAS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT THE ELEMENTS HAD BEEN PROVEN BEYOND A REASONABLE DOUBT."
{¶ 56} Article IV, Section 3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." State ex rel. Squire v. City of Cleveland (1948),150 Ohio St. 303, 345.
{¶ 57} The standard employed when reviewing a claim based upon the weight of the evidence is not the same standard to be used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions in Tibbs v. Florida (1982), 457 U.S. 31, where the Court held that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal; i.e., invocation of the double jeopardy clause as a bar to relitigation. Id. at 43.
{¶ 58} Upon application of the standards enunciated in Tibbs, the court in State v. Martin (1983), 20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The Martin court stated:
 {¶ 59} "There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."
{¶ 60} Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues primarily for the trier of fact. State v. DeHass, supra. Hence, we must accord due deference to those determinations made by the trier of fact.
{¶ 61} The most damaging evidence against the appellant below was the testimony of Kenneth Smith that the appellant had spoken to him of the victim's murder in a conversation which took place at 1:54 p.m. on the afternoon that the body was discovered. Police did not respond to the apartment complex until 3:13 p.m. that afternoon. Prior to the police response to the scene, there was no way that the appellant could have known of the murder had he not been involved. Smith also stated in his testimony that the appellant seemed unusually shook up by the death of the victim given her age and failing health, as well as the nature of their relationship. This was consistent with other testimony that the appellant seemed unusually emotional about the death of the victim including testimony from one of the police officers who initially responded to the scene that the appellant was "bawling" in the lobby of the LaRonde apartment complex.
{¶ 62} The testimony of Donald Hutchinson, if believed by the jury, was fatal to the appellant's hopes for acquittal. Hutchinson testified that the appellant told him that he let himself into the apartment for the purpose of stealing money from the victim and then beat her to death after she awoke and threatened to report him to authorities, before absconding with $700. The jury may have found this testimony credible because of the details provided by Hutchinson, that seemingly only could have been known by the assailant, and because of the testimony of Sarah Harris who placed the appellant in the victim's apartment in the early morning hours of December 17, 1999, where he could have observed the victim's stash of money while he was returning her to her recliner, and who also stated that she distinctively remembered that the appellant locked the victim's door behind them when she and the appellant left the victim's apartment that morning.
{¶ 63} The testimony by the Ameritech representative that the victim could not have placed a phone call to the appellant in the early morning hours was not competent, credible evidence that could have been relied on by the jury. This phone company representative stated that the victim did not make or receive any phone calls from December 16th at 6:00 p.m. to December 17th at 3:00 p.m. when she was found dead. Yet, Sarah Harris as well as Tommy Williams, another resident of the apartment complex who frequently ran errands for the victim, each testified that they had in fact spoken with the victim via telephone during the relevant time period.
{¶ 64} If the appellant and Harris did actually go to the victim's apartment to help the victim up off the floor in the early morning hours of December 17, 2000, and there is no reason to believe that they did not, the victim obviously must have called somebody to inform him or her of her plight. There is also no reason to disbelieve Williams' testimony that he talked on the phone with the victim on the evening of December 16th concerning a planned errand the next day, considering that he did in fact go out and procure string beans for the appellant on the morning of December 17th. Furthermore, Williams testified that he subsequently attempted to deliver the beans to the victim, consistent with the arrangement he stated that he made with the victim the prior evening when he spoke to her on the phone and when she also requested that he deliver to her a bottle of pop. Williams also testified that he attempted to call the victim "about four times" in the late morning/early afternoon hours of December 17th, which is during the time period that the phone logs showed that the victim did not receive any phone calls.
{¶ 65} Yet, even if we do not consider the evidence concerning the phone records, which, if believed, would still be of questionable relevance, this court is not able to disturb the jury verdicts under a manifest weight of the evidence analysis. The testimony of Smith and Hutchinson and the fact that there was no forcible entry into the victim's unit, as well as other circumstantial evidence discussed throughout this opinion, provided a sufficient basis for the convictions. We are unable to say that the jury clearly lost its way and created a manifest miscarriage of justice. Thus, this assignment of error is not well taken.[2]
{¶ 66} The appellant's ninth, tenth and eleventh assignments of error all deal with the sentence imposed by the trial court and the alleged failure of the trial court to comply with provisions of the relevant sentencing statutes. These assignments of error state:
 {¶ 67} "IX. THE TRIAL COURT ERRED WHEN IT IMPOSED MORE THAN THE MINIMUM TERMS OF IMPRISONMENT ON MR. AYERS, A FIRST OFFENDER, WITHOUT MAKING THE NECESSARY FINDINGS REQUIRED BY R.C. 2929.14(B)."
 {¶ 68} "X. THE TRIAL COURT ERRED IN IMPOSING THE MAXIMUM SENTENCE PURSUANT TO R.C. 2929.145(C) WHERE IT DID NOT FIND OR SET FORTH FACTORS SUPPORTING THAT THE APPELLANT HAD COMMITTED THE WORST FORM OF THE OFFENSE OR THAT THE APPELLANT POSED THE GREATEST LIKELIHOOD OF COMMITTING FUTURE CRIMES."
 {¶ 69} "XI. THE TRIAL COURT ERRED BY ORDERING CONSECUTIVE SENTENCES WHEN IT FAILED TO MAKE ANY OF THE NECESSARY FINDINGS OR REASONS FOR THE FINDINGS REQUIRED BY R.C. 2929.14(E)(4)."
{¶ 70} Initially, we note in response to the ninth assignment of error, that because the trial court imposed the maximum sentences permitted by law, we are able to infer that it considered and rejected the possibility of imposing the minimum sentences.
{¶ 71} When imposing the maximum sentence for an offense, the sentencing court is required to do two things. First, the sentencing court must make a finding that the offender committed the worst form of the offense or that offender poses the greatest likelihood of committing future crimes. See R.C. 2929.14(C). Second, the sentencing court must state reasons that support its findings. See R.C. 2929.19(B)(2)(d).
{¶ 72} In the instant case the trial court completed a Felony Sentencing Findings Journal Entry and incorporated it into the record as part of its journal entry. The court made several findings in this journal entry justifying the imposition of consecutive sentences, but did not make any of the required findings necessary for the imposition of the maximum sentence under R.C. 2929.14(C), or its reasons for imposing the maximum sentence per R.C. 2929.19(B)(2)(d). Although the trial court's imposition of the sentence of life with parole eligibility after twenty years on the aggravated murder count was in accordance with R.C. 2929.03, the trial court was required to make findings justifying the imposition of the maximum sentences which were imposed on the aggravated burglary and aggravated robbery counts. Because the record does not indicate that the trial court made these required findings, we are compelled to remand for resentencing.
{¶ 73} We note that by remanding for resentencing we are not expressing disapproval of the "checklist" sentencing form used by the trial court as part of its sentencing journal entry. The trial court's utilization of such a form is an acceptable method of complying with the sentencing statutes. See State v. King (Sept. 14, 2000), Cuyahoga App. No. 76696; State v. Thomas (June 15, 2000), Cuyahoga App. No. 76382; State v. Snedegar (July 16, 1999), Hamilton App. No. C-980078. If the trial court had checked the required findings for the imposition of the maximum sentence, we would have likely affirmed the sentence imposed. Yet, because the required findings were not made either in the journal entry or the form attached thereto by reference, the sentence fails to comply with the relevant statutory sentencing provisions. Thus, assignment of error ten is well-taken.
Judgment affirmed in part, reversed in part and remanded for resentencing.
This cause is affirmed in part, reversed in part and remanded for resentencing.
Costs assessed against plaintiff-appellee.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., CONCURS IN JUDGMENT ONLY.
ANNE L. KILBANE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE CONCURRING AND DISSENTING OPINION.
[1] This court is troubled by the timing employed in responding to discovery requests. The state's position that information was not discovered until shortly before trial is suspect. Long before trial it is the state that presents matters to the grand jury, the state that seeks consideration of certain charges, and the state that assembles the file and prepares the appropriate paperwork. In matters appropriately prepared and reviewed prior to grand jury presentment with rare exception all of the pertinent evidence ought be available long before trial and, therefore, discoverable in a timely fashion.
[2] It appears the dissent is now working as an advocate for Ayers, candidly admitting that one of its goals is to "stimulate further inquiry into this case." This willing advocacy takes the form of speculation throughout, from its admitted leaps beyond the record to its insinuation that the jury requested a transcript of Smith's testimony because that testimony was "far from unequivocal." The dissent knows full well that it cannot competently say exactly what the jury thought during its deliberations (unless it has strayed so far from the record as to have spoken to the jurors), particularly as to Smith's testimony. Its single-minded goal of reversing twelve unanimous jurors forces it to guess, and this guesswork destroys any semblance of impartiality the dissent might have — not that the dissent makes any claims of being impartial. Paradoxically, these leaps beyond the record prove the dissent's lament about the criminal justice system failing to instill confidence in the public.