JOURNAL ENTRY AND OPINION
{¶ 1} The appellant, Nicole Rickett, appeals from the jury verdict in favor of appellees, University Hospitals of Cleveland, et al. ("UH"), in her medical negligence complaint, which arose out of the obstetric care rendered by UH during the delivery of appellant's deceased baby.
 {¶ 2} Rickett, a 22-year-old, was admitted to UH at approximately 9:00 p.m. on the evening of July 17, 1997 at approximately 38 weeks of pregnancy, which is considered full term. The record reflects that she had very little prenatal care prior to being admitted and was suffering from trichomonas, a vaginal infection. Although she was notified that trichomonas was treatable and could complicate her pregnancy if left unattended, she refused treatment for the infection.
 {¶ 3} On the morning of July 18, 1997, UH administered pitocin to facilitate Rickett's labor and delivery. At that time, her overall labor progress and health were unremarkable except for the diagnosis of trichomonas. The baby's vital signs were normal. Later that evening, her labor progression was not proceeding as anticipated. Accordingly, the treating physicians determined the pitocin was ineffective and administered Cervidil to her overnight to soften and dilate her cervix.
 {¶ 4} On the morning of July 19, 1997, Rickett's labor was progressing normally, and it was determined that the pitocin be readministered. That same morning, she developed chorioamnionitis, a localized infection of the lining of the placenta. She was administered Unasyn, an antibiotic which treated and controlled the symptoms.
 {¶ 5} Rickett's hospital chart describes her as a challenging patient who refused medications and treatments offered during this time frame. Further, we note that during her labor, the fetal monitor tracings were consistently monitored and charted with no abnormal indications. Additionally, the record reflects that she was offered medication and pain control options, which she summarily refused. Rickett refused Tylenol to reduce fever from the chorioamnionitis. Further, she refused other pain control options, including an epidural anesthetic. The record additionally indicates that on several occasions, she removed the monitors utilized to track both her and her baby's vital signs. On one occasion, the record indicates that she removed the fetal monitors, left her bed and was later found lying on the floor in the hallway. During this period, the baby was not being monitored.
 {¶ 6} Later on the afternoon of July 19, 1997, Rickett agreed to have the epidural block performed. There were no signs of fetal distress at that time. A scalp monitor was attached directly to the baby's head to monitor its heart rate, however, the electrode did not provide a clear reading of the baby's heart rate. Therefore, an ultrasound was performed, which revealed a fetal heart rate of 120; however, after detecting the fetal heart rate of 120, the heart rate abruptly stopped or became undetectable.
 {¶ 7} This was the first sign of fetal distress, and within ten minutes of its discovery, an emergency Caesarean section ("C-section") was performed, according to the record. The operating physician observed bloody fluid in the uterus, which indicated an abnormality. Further, the placenta, which allows the baby to obtain oxygen and nutrients, was discovered to be detached from the uterus.
 {¶ 8} The baby was thereafter delivered within one minute of the first C-section incision with a heart rate of 0 and Apgar scores of 0, 0, 0.[1] The baby had a heartbeat, but was not breathing. Resuscitation attempts were performed for over one hour and fifteen minutes, but were unsuccessful.
 {¶ 9} On January 8, 1999, Rickett originally filed a complaint asserting claims of medical negligence, which was dismissed without prejudice on September 3, 1999, pursuant to Civ.R. 41(A). She refiled her complaint asserting medical negligence on August 25, 2001 against defendants UH, Nancy E. Judge, M.D., R. Loret DeMola, M.D., Fadil Khoury, M.D., Stephanie George, M.D., and Jeffrey Chapa, M.D. Prior to trial, Rickett dismissed all defendants with the exception of UH. At trial, she alleged UH negligently monitored her labor, her baby's condition, and failed to timely perform a C-section, thereby leading to the death of her child.
 {¶ 10} The matter proceeded to trial on April 11, 2002. Thereafter, on April 17, 2002, the jury returned a verdict in favor of UH finding the employees of UH were not negligent in the care and treatment rendered to Rickett after she was admitted to the hospital. Rickett timely appeals this verdict and presents one assignment of error for our review.
 {¶ 11} "I. THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 12} As long as there exists competent and credible evidence in the record to support the jury's decision, it will not be reversed as against the manifest weight of th evidence. C.E. Morris Co. v. FoleyConstruction (1978), 54 Ohio St.2d 279 at syllabus. Article IV, Section3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." State ex rel. Squire v. City of Cleveland (1948),150 Ohio St. 303, 345.
 {¶ 13} The standard employed when reviewing a claim based upon the weight of the evidence is not the same standard to be used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions in Tibbs v.Florida (1982), 457 U.S. 31, where the Court held that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal, i.e., invocation of the double jeopardy clause as a bar to relitigation. Id. at 43.
 {¶ 14} Upon application of the standards enunciated in Tibbs, the court in State v. Martin (1983), 20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The Martin court stated:
 {¶ 15} "There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."
 {¶ 16} Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. Hence we must accord due deference to those determinations made by the trier of fact. The reviewing court must be guided by the presumption that the jury's factual findings are correct. Season Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77. The jury is best able to view the witnesses and make observations as to their demeanor, gestures and voice inflection and use these observations to judge the credibility of the testimony. Id.
 {¶ 17} The appellant argues the jury verdict was against the manifest weight of the evidence because UH should have performed a C-section upon discovering the appellant's chorioamnionitis. Furthermore, the appellant argues the sudden abruption of the placenta does not substitute as an intervening cause as to UH`s negligence in the course of her care and the baby's care.
 {¶ 18} In order to establish a medical negligence claim, a plaintiff must prove, by a preponderance of the evidence, that the defendant failed to meet accepted standards of care in the treatment of the plaintiff. Bruni v. Tatsumi (1976), 46 Ohio St.2d 127. "In other words, the defendant failed to exercise that same degree of care, skill, and diligence that other physicians would utilize under the same or similar circumstances, and the actions of the defendant or omission to act were to a reasonable degree of medical probability the direct and proximate cause of the resulting injury." Id. The standard of care, and breach of that standard, and causal connection shall be established by expert medical testimony. Hoffman v. Davidson (1987), 31 Ohio St.3d 60.
 {¶ 19} The appellant and UH provided conflicting expert opinions to the jury. The appellant's expert, Michael Baggish, M.D., has practiced medicine for the past 15 years in the field of gynecology. Dr. Baggish based his opinion upon reviewing the medical records provided by appellant's counsel. Dr. Baggish did not criticize the administering of the epidural block, prenatal care, postpartum care, hospital staffing or nursing care. However, he opined with a reasonable degree of medical certainty that a C-section should have been performed earlier on the same date, July 19, 1997, between 9:30 a.m. and 12:30 p.m.
 {¶ 20} Dr. Baggish further testified that the fetal distress began immediately after the epidural, and the C-section should have been perform immediately afterward. Dr. Baggish also opined that the administration of pitocin to aid in the progression of labor was excessive beyond the standard of care, and he attributed the cause of death to the chorioamnionitis. He acknowledged that the appellant had experienced an abruption of the placenta.[2]
 {¶ 21} UH's expert, Dr. Harlan Giles, is a board certified obstetrician and gynecologist specializing in maternal fetal medicine or perionatology. Dr. Giles has over 30 years of experience in high risk pregnancy, birth defect counseling and testing, ultrasound, genetic counseling and teaching obstetrics and gynecology. Dr. Giles reviewed the appellant's outpatient prenatal records and lab reports, the baby's chart, the fetal monitoring strips of the appellant's labor and delivery, and the depositions of Dr. Chapa, Dr. Redline and the appellant. He testified that the appellant's physician care team complied with the standards of care, properly formulated a plan for delivery, treated appellant's temperature and chorioamnionitis appropriately and proceeded to attempt vaginal delivery of the baby as he would have done.
 {¶ 22} Dr. Giles opined the first indication of fetal stress occurred on July 19, 1997 at approximately 3:30 p.m., subsequent to the epidural. The baby's heart rate ceased, then restarted and ceased again. The care team prepared the appellant for an emergency C-section, which was initiated within eleven to twelve minutes after the first signs of fetal distress. The baby was delivered within one minute of initiating the C-section. Dr. Giles further opined that, to a reasonable degree of medical certainty, the cause of the baby's death was early separation of the placenta. Furthermore, Dr. Giles did not find a correlation between the chorioamnionitis and the abruption and the pitocin and the abruption.
 {¶ 23} Dr. Raymond Redline, a UH pediatric pathologist, testified via videotape. Dr. Redline examined the placenta in the pathology department. He testified, to a reasonable degree of medical certainty, that the cause of death of the appellant's baby was an abruption of the placenta. Dr. Redline discussed two findings that support his conclusion about the cause of death: (1) bright red amniotic fluid and (2) the placenta was delivered intact, partially separated from the uterus.
 {¶ 24} The following doctors, who comprised appellant's care team during the labor and delivery process from July 17 to July 19, 1997, testified on behalf of UH: Dr. Chapa, the treating senior resident physician in obstetrics and gynecology; Dr. Fadil Khoury, a second year resident; Dr. George, the chief resident; and Dr. Loret DeMola, the attending physician. The care team testified that the status of the mother and vital signs of the baby did not warrant a C-section prior to the baby exhibiting signs of fetal distress on July 19, 1997. Furthermore, these physicians all testified that their treatment of the appellant complied with the standard of care.
 {¶ 25} In reviewing the record and transcript of the proceedings, we cannot conclude that the verdict of the jury was against the manifest weight of the evidence. Both the appellant and UH offered differing expert testimony and opinion with regard to the proper standard of care. Further, UH offered the testimony of numerous members of the appellant's care team, each testifying that the standard of care was complied with.
 {¶ 26} Since both parties offered differing testimony concerning the cause of death of the appellant's child, the jury was the proper body to weigh the evidence and credibility of the witnesses, and the judgment in favor of the appellee reflected the will of the jury. Clearly, there exists competent, credible evidence based on substantial testimony and evidence in the record for the jury to base its decision upon, notwithstanding the appellant's expert testimony.
 {¶ 27} Therefore, since there exists competent and credible evidence in the record to support the jury's decision, we will not reverse the judgment of the jury as against the manifest weight of the evidence.
Judgment affirmed. MICHAEL J. CORRIGAN, P.J., AND COLLEEN CONWAYCOONEY, J., CONCUR.
[1] A score is given for 1) Activity (Muscle Tone), 2) Pulse, 3) Grimace (Reflex Irritability), 4) Appearance (Skin Color), and 5) Respiration at one minute and five minutes after the birth. If there are problems with the baby, an additional score is given at 10 minutes. A score of 7-10 is considered normal, while 4-7 might require some resuscitative measures, and a baby with apgars of 3 and below requires immediate resuscitation. Apgar Scoring for Newborns,http://childbirth.org/articles/apgar.html, Copyright 1994-1998, Childbirth.org.
[2] An abruption is a sudden separation of the uterus from the placenta that can cause the death of the baby within minutes of separation. The placenta provides oxygen and nutrients to the baby.